Donald C. CLARK, Garrett B. Clark and
Michael D. Magnuson,
Defendants-Appellants,

v.

STATE of Indiana, Plaintiff-Appellee.

No. 1–278 A 31.

Court of Appeals of Indiana,
First District.

May 9, 1979.

Rehearing Denied July 10, 1979.

David J. Colman, Guy R. Loftman, Colman, Lowenthal, Loftman & Richardson, Bloomington, for defendants-appellants.

Theodore L. Sendak, Atty. Gen., Richard Albert Alford, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

LOWDERMILK, Presiding Judge.

### STATEMENT OF THE CASE

Defendants-appellants Donald S. Clark and Garrett B. Clark appeal from their convictions for possession of a controlled substance; the Clarks and defendant-appellant Michael D. Manguson appeal from their convictions for conspiracy to commit a felony.

 First of all Clark, *et al.* contend that they were denied a fair trial due to the misconduct of the prosecutor and one of the deputy jailers, who, Clark, *et al.* maintain, improperly influenced Scott Oliver, a witness who identified the Clarks as being present at an airplane where 2 tons of marijuana were unloaded into a truck by Oliver, into identifying the Clarks. The evidence shows that at a pre-trial hearing on a motion to suppress Oliver stated that he could not positively identify the Clarks or Manguson as the ones who were present when the marijuana was unloaded at the airport. That night the deputy prosecutor visited Oliver at the jail and reminded him of a statement he had made on April 14, 1977, wherein he had identified the Clarks as being present when the marijuana was

unloaded from the airplane. The deputy prosecutor explained to Oliver that his lying while under oath at the suppression hearing constituted perjury and that a conviction for perjury carries with it a prison term of up to five years.

At trial the next day Oliver identified two of the three defendants as being present at the airplane from which the marijuana had been unloaded. He acknowledged that the deputy prosecutor had talked to him the night before concerning his possible perjury violation; but he also unequivocally stated that he was not threatened by the deputy prosecutor in any way.

Clark, *et al.* contend that the deputy prosecutor's actions in effect suppressed testimony which was favorable to them, thereby denying them due process of law. We disagree.

Although defense counsel has presumptuously characterized the deputy prosecutor's conduct as "unethical and reprehensible," and has drawn conclusions unsupported by the evidence in an attempt to show that the deputy prosecutor "threatened and browbeat" Oliver, we hold that, from the record as contained in the transcript of proceedings in the trial court, we have been presented with nothing which convinces us that the deputy prosecutor engaged in misconduct when he visited Oliver at the jail. From the citations to the record which defense counsel has provided we find no evidence that the deputy prosecutor visited Oliver *late* at night, nor that he threatened and browbeat Oliver; neither do we find evidence that Oliver had been deprived of sleep, nor that Oliver had been subjected to "overwhelming pressure exerted by a desperate prosecutor willing to go to any lengths to salvage an evaporating case." Such characterizations are presumptuous and wholly unsupported by the record.

The substance of Oliver's testimony on this matter is contained in the following passages from the transcript which is a transcript of Oliver's direct examination by the deputy prosecutor.

"151. Q Now, do you recall being sworn under oath sometime around April 14, 1977?
A Yes.

*   *   *   *   *   *

153. Q Do you recall me asking you basically, in general, the same questions that were asked here with regard to identity of individuals unloading the plane?
A Yes, sir.

154. Q And were you able to give a response to those questions as to who assisted you in unloading the plane?
A Yes, sir.

155. Q Is that the same answer that you gave today?
A More or less.

156. Q Now let's go to yesterday morning, which would be July 5, 1977, did you have occasion to testify in this courtroom at a hearing?
A Yes, sir.

157. Q Do you recall one of the attorneys for the defendants asking you whether you could identify anyone in the courtroom at that time as being the ones who assisted you in unloading the plane?
A Yes.

158. Q Do you recall what your answer was then?
A I didn't think I could.

159. Q Were you telling the truth then, Scott, at that hearing yesterday morning?
A No, sir.

*   *   *   *   *   *

165. Q The testimony that you have on April 14 and the testimony that you have given here this morning, is that true to the best of your knowledge?
A Yes, sir.

166. Q Have I made any promises or threats to you to get you to change your story?
A No, sir.

"167. Q  Did we have a discussion after that hearing yesterday?
A  It was last night.

168. Q  And at that discussion, did I give you a copy of your statement on April 14?
A  Yes, you did.

169. Q  Had you seen that statement prior or since the April 14—
A  I saw it the day of the 14th, but I never received one.

170. Q  So you had not seen it from that date until last night?
A  I didn't see it officially written up, no, sir.

171. Q  And do you recall reading it last night or early this morning?
A  I sure do.

172. Q  And were the things in that statement true, are they true now in terms of your testimony to the best of your knowledge?
A  Yes, sir."

Both of the citations[1] which Clark, et al. have provided to us in an attempt to show that the actions of the deputy prosecutor in the case at bar constituted misconduct, represent blatant attempts by a judge in one instance and an assistant district attorney in another to threaten and intimidate a defense witness in open court in order to keep that witness from testifying in favor of the defendants in the respective cases. The case at bar is distinguishable from *Webb, supra,* and *Jennings, supra,* in that in this case the record does not support the conclusion that the deputy prosecutor threatened and intimated the witness, nor does the record show that the deputy prosecutor coerced Oliver into refusing to testify for Clark, et al. Also in the case at bar Oliver had made two prior inconsistent statements under oath. In *Webb, supra,* and *Jennings, supra,* such was not the case. In light of the record with which we have been presented we hold that the deputy prosecutor's actions did not constitute misconduct and that Clark, et al. were not denied due process of law.

Clark, et al. next contend that they were denied due process of law when during a lunch break a deputy jailer suggested to Oliver that Oliver may have identified Manguson as one of the Clark brothers. After the lunch break Oliver testified that he never did know the names of the defendants, that he simply knew that two of the defendants were named Clark and one was named Manguson, and that he really didn't know which one was which. Clark, et al. objected to Oliver's change of testimony because it was, they contend, tainted by the deputy jailer's suggestion that Oliver may have mistakenly identified Manguson as one of the Clark brothers.

The situation in the case at bar is analogous in many ways to that which occurred in *Hightower v. State* (1973) 260 Ind. 481, 296 N.E.2d 654, wherein, although a separation of witnesses order was in effect, the prosecutrix in a statutory rape case changed part of her testimony after discussing the matter with the prosecutor and with her sister, who was also a witness. In *Hightower, supra,* at 296 N.E.2d 657–658 our Supreme Court stated the following:

"Appellant asserts that his motion for mistrial made at that point should have been sustained because the witnesses Rebecca and Brenda had violated the court's order prohibiting the discussion of testimony among witnesses, and that the prosecutor had acted incorrectly in approaching Rebecca and asking her about her testimony. It might be pointed out that technically the order was not violated since it applied only to witnesses who had not yet testified and both Rebecca and Brenda had already testified when the conversation about Johnnie's took place. In any event it can hardly be said that the remedy for a violation of this court order, if indeed there was one, is a mistrial. There is no reason why this testimony should not be admissible much less require a reversal of a conviction. *The jury was completely informed of the*

1.  See *Webb v. Texas,* (1972) 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330, and *Commonwealth v. Jennings* (1973) 225 Pa.Super. 489, 311 A.2d 720.

*conversation between the witnesses after Rebecca's original testimony and was given adequate information by which it could judge the reliability and credibility of the revised testimony. All of this is in complete accord with the jury's prime function of determining the weight which testimony should be afforded.* If the trial court found that the conversation between Rebecca and Brenda had violated its order it could take appropriate steps to enforce it or punish its violation, but it cannot be said that such violation automatically entitles a defendant to a new trial.

The allegation concerning the role of the prosecutor in Rebecca's revised testimony is also without merit since *conversations between attorneys and their witnesses are never barred by court orders such as this one, and the order in this case does not attempt to do so. It is certainly not improper for any attorney to discuss the testimony of his witnesses with them before or after they have testified. Furthermore this conversation was fully explored on cross examination by defense counsel and the jury was again adequately appraised of this aspect of the revised testimony.*" (Our emphasis)

In the case at bar, as in *Hightower, supra,* the jury was in a position to evaluate the circumstances underlying Oliver's testimony and to judge Oliver's credibility. In light of these factors we hold that the trial court did not err in denying the motion for mistrial which was made by Clark, et al.

On two occasions ex parte discussions outside of the presence of defendants or their counsel occurred between the judge and the deputy prosecutor concerning matters connected with the case at bar. On one occasion the deputy prosecutor in an ex parte conversation told the judge that one of the State's witnesses had inadvertently entered the courtroom and heard part of the testimony of another witness, even though a separation of witnesses order was in effect. After finding out who the witness was the judge told the deputy prosecutor not to worry about it. The deputy prosecutor then informed defense counsel of the presence of the witness in the courtroom.

On another occasion the judge was in his office talking to a friend when the deputy prosecutor stepped inside the door and mentioned to the judge that he thought that the judge had made an improper ruling in overruling the deputy prosecutor's objection to certain questions which had been asked by defense counsel. The deputy prosecutor thought that the defendants' cross-examination had exceeded the scope of the State's direct examination. The judge had not even answered the deputy prosecutor when one of the defendants' counsel entered the office and objected to the ex parte "discussion."

A hearing was held on the effect of these ex parte "discussions" upon the trial, and the court overruled the defendants' motion for a mistrial. Clark, *et al.* argue that they were effectively denied the right to counsel by these ex parte encounters between the judge and the prosecutor and that they were prejudiced thereby. We disagree.

Although ex parte discussions concerning a given case between a judge and an attorney participating in that case should be and are sincerely discouraged, not every such encounter is prejudicial to the defendant. In order for error to constitute reversible error such must be prejudicial to one of the parties. See Ind.Rules of Procedure, Trial Rule 61.

In the case at bar no prejudice to the defendants was shown. The judge had already ruled on the matter which the deputy prosecutor mentioned to the judge in the judge's office, and the judge did not later change that ruling. As to the incident concerning the witness in the courtroom, the sole purpose of the testimony of that witness was to identify the marijuana through scientific tests. The witness had a bachelor's degree with a major in biology and a minor in chemistry. He had taken courses in drug identification at law enforcement institutes. The witness had performed three separate tests on the plant material, all of which showed the substance to be

marijuana. These tests were performed and the opinion as to the identity of the plant material was formulated well in advance of the trial. It was highly unlikely that the opinion of such an expert witness was swayed, as Clark, *et al.* suggest, by overhearing a small portion of Scott Oliver's testimony where the words "marijuana" and "pot" were intermittently used. We, therefore, hold that no prejudicial error resulted from the ex parte encounters between the judge and the prosecutor.

■ Clark, *et al.* next contend that the trial court erred in interrupting defense counsel during closing argument by telling defense counsel that his statements, concerning the fact that witness Scott Oliver would only serve four months, instead of nine months, at the State Farm, were not true and that such should not be discussed during final argument. We disagree.

In *Lockbridge v. State*, (1975) 263 Ind. 678, 338 N.E.2d 275, 282, our Supreme Court stated:

"A trial court has discretion in controlling argument before a jury. Absent abuse of this discretion, the ruling of a trial court will not be disturbed. *Owens v. State* (1975) 263 Ind. 487, 333 N.E.2d 745. . . ."

We find no such abuse in the case at bar. In fact we find that the trial court properly interrupted defense counsel in that it, indeed, was not necessarily true that Oliver would serve four months instead of nine. Such was possible but not certain, as counsel's statement indicated it would be.

■ Next Clark, *et al.* contend that the jury selection procedure was inconsistent with Ind.Code 33–4–5–2, which provides that the jury commissioners "shall not select the name of any person who is not a voter of the county, or who is not either a freeholder or householder" and was in violation of defendants' right to a fair trial. The clerk's certificate in the case at bar shows that the jury was selected from among those persons who were freeholders or householders *and* resident voters. We find no error in the jury selection procedure.

Clark, *et al.* contend that the only reasonable construction which can be placed upon the clerk's certificate is that the jury panel was drawn from persons who were freeholders or householders who were registered voters. This, they contend, eliminates householders who are not registered voters.

We see no inconsistency. IC 33–4–5–2 does not require that all three groups be represented on the list from which the jury is chosen. It simply states that a prospective juror cannot be chosen to be a juror unless prospective juror is a freeholder or householder or resident voter. If we play the grammatical game which Clark, *et al.* suggest, then the list from which jurors are chosen could be made up solely of freeholders *or* solely of householders *or* solely of resident voters or *any* combination thereof. Thus even with the construction which Clark, *et al.* have placed on the clerk's certificate, the technical requirements of the statute have been met.

At trial the court took judicial notice of the fact that the jury panel was selected at random from the lists of registered voters. Clark, *et al.* have presented this court with no cogent argument or citation of authority which convinces us that such taking of judicial notice was error.

As a final note on this question we quote from *Taylor v. State* (1973) 260 Ind. 264, 295 N.E.2d 600, 605:

". . . The use of lists, whether they be property taxpayers or registered voters, so long as they represent a reasonable cross section of the people of the county, cannot be said to violate the rights of the accused, in the absence of a showing that such use is made in a deliberate attempt to exclude certain groups from jury selection. . . ."

Clark, *et al.* have not shown that the county made a deliberate attempt to discriminate against prospective jurors of any particular race, religion, color, creed, sex, or economic status. Even if the clerk's certificate were to be construed as Clark, *et al.* suggest, such would nonetheless be a representative and reasonable cross section of the people of the county.

Clark, *et al.* finally contend that the cumulative effect of the alleged judicial bias, prosecutorial misconduct, and errors of law at trial was to deny them their right to a fair trial. We disagree. In our review of the record we have found very few errors, and those errors which did occur were harmless.

■ Finally, we note that the brief and reply brief of the defendants-appellants contain numerous inflammatory and inaccurate statements. Those briefs are replete with hyperbole and innuendo, most of which relate to descriptions, which are shown by the record to be largely inaccurate, of the conduct of the judge and deputy prosecutor. An example of such is found on page 14 of the reply brief of defendants-appellants where it states:

". . . Prosecutorial misconduct included threatening a witness to induce change in his testimony, using perjured testimony, repeatedly initiating *ex parte* discussions with the Judge on matters of concern in the trial of this case. The Court improperly chastised Defense Counsel in the presence of the jury, misremembered the record, refused to replay it and ruled in reliance on his failing memory, participated in repeated *ex parte* discussions with the Prosecutor, made repeated comments, and spontaneously interrupted Defense Counsel on numerous occasions. . . ."

The record does not support defense counsel's presumptions that the witness was *threatened*, that the prosecutor *used perjured* testimony, that the State *induced* a witness to commit *perjury*, that the court *improperly* chastised defense counsel in the presence of the jury, that the court has a failing memory,[2] and that the court *improperly* interrupted defense counsel on those numerous occasions; neither does the record support defense counsel's *description* of the ex parte "discussions" between the judge and the prosecutor. We fully recognize how important it is for counsel to zeal-

ously represent his client. However, zeal cannot replace propriety. Because of defense counsel's inaccurate statement of facts and counsel's replacement of fact with presumption it has been necessary for this court to spend several hours consulting the transcript to learn what *actually* occurred in the trial court.

Trial judges must not be the object of such disrespectful conduct of inconsiderate counsel. The blatant misquotes and untruths set forth in the briefs of Clark, *et al.* are certainly beyond the bounds of law and ethical consideration. Justice Prentice in speaking of the growing tendency among some lawyers to be careless, if not deliberately misleading, in their representations to the court through their briefs said "[c]learly a deliberate misleading of the Court upon factual matters is misconduct demanding severe disciplinary action. Honest errors and oversights are understandable and tolerable, but when numerous representations of fact prove to be inaccurate, we are justified if we question the proponent's good faith." *Loza v. State*, (1975) 263 Ind. 124, 135, 325 N.E.2d 173, 179.

This court, in the future, will not tolerate purposeful and deliberate misstatements of the record and untruths in attorneys' briefs, and any attorney so doing must consider his actions an invitation for disciplinary action.

Judgment affirmed.

BUCHANAN, C. J. (participating by designation), and ROBERTSON, J., concur.

---

2. Failure to remember certain items is a foible which is common to all men, but the use of the term "failing memory" as used here carries with it a derogatory and disrespectful connotation.