GEORGE L. TAYLOR *v.* STATE OF INDIANA.

[No. 272S14. Filed May 3, 1973.]

*Richard C. Rusk,* of Washington, for appellant.

*Theodore L. Sendak,* Attorney General, *Mark Peden,* Deputy Attorney General, for appellee.

GIVAN, J.—Appellant was indicted for murder in the second degree. A jury trial resulted in a verdict of guilty as charged.

Appellant was sentenced to the Indiana State Prison for not less than fifteen nor more than twenty-five years.

The record in this case discloses the following facts:

Prior to trial, the appellant filed a motion to challenge the array of the jury panel on the ground that the panel had been selected from the list of registered voters in the county; that the county had approximately two thousand Amish residents who did not register to vote; that, therefore the manner of choosing the jury from the list of registered voters had the effect of excluding Amish from jury duty. This motion was denied.

Appellant then filed a motion to suppress evidence and requested that all members of the public be excluded from the court room on the hearing on his motion to suppress. This motion was denied and after public hearing on the motion, the motion to suppress was also denied.

The appellant filed a motion for employment of an expert pathologist and for an order to disinter the body of the deceased in order that the appointed pathologist could make an examination. These motions were also denied.

During the course of the trial the appellant filed a motion to produce a copy of the testimony of each witness who testified before the grand jury as well as any written statement given to the police or to the prosecuting attorney. This motion was granted and copies were furnished as ordered, with the exception of a written statement made by one Thomas Ferguson, which the State represented to the court it was unable to find. The court, therefore, upon motion of the appellant instructed the jury to disregard the testimony of Thomas Ferguson.

The State presented the following evidence:

On the evening of April 3, 1971, the appellant, his mother and several of his brothers and sisters, together with some of their friends, were gathered at the home of appellant's mother.

The appellant, together with several of those present, soon left the home to go to the Eagles, leaving appellant's mother and three of his sisters at the home.

While at the Eagles, the appellant became intoxicated and became quite belligerent, especially toward one of his sisters and a brother.

Appellant left the Eagles and returned to his home, where he first engaged a friend, who had just arrived, in an argument. Appellant then went into the house where he obtained a pistol.

Appellant's mother, the decedent in this case, asked the appellant to put the gun away. However, appellant went out on the front porch and fired a shot in the air. At about the same time, one of appellant's sisters and her friend arrived from the Eagles and were asked by the decedent to leave because the appellant had a gun. As the girls left, the appellant ran after them and fired two shots at the car in which they left.

Appellant again returned to the house and entered his mother's bedroom where his nine year old sister was asleep and where his brother, Mike, had taken refuge. Appellant first pointed the gun at his sleeping sister and tried to awaken her. He then realized his brother was in the room seated in a chair. Appellant pointed the pistol at his brother, stating that he was going to shoot him. Appellant's mother stepped between appellant and his brother, again admonishing him to put the gun away. However, appellant fired the pistol, striking his mother.

Appellant immediately showed remorse for his action and asked his mother for forgiveness, which she gave. He then attempted to use the telephone to call an ambulance. Appellant, however, in calling the ambulance gave the wrong address, then broke the telephone. Appellant's brother ran next door and called the ambulance.

When police officers arrived, the decedent was still alive,

but bleeding from an abdominal wound and a wound in the back. Decedent died shortly after arriving at the hospital emergency room. The attending physician testified as to the wounds and further testified that examination led to the conclusion that the decedent's abdominal cavity was full of blood as a result of the inflicted wound, and that it was the combination of loss of blood and shock that caused the decedent's death.

Decedent's body was first removed to a funeral home where the embalming procedure was begun, including the placing of plastic plugs in the abdomen and the back.

After the embalming procedure had been commenced, the body was then removed to the hospital where an autopsy was performed. The doctor who performed the autopsy testified that in his opinion the nature of the wound indicated that it could have been caused by a bullet, and that the abdominal wound was the entrance wound and that the wound in the back was the exit wound made by the same bullet. The doctor testified that even though plastic plugs had been inserted in the wounds, it appeared the abdominal wound was somewhat smaller than the wound in the back and that microscopic examination of skin tissue from both wounds indicated that the abdominal wound had been made by an object hot enough to cause typical distortion of skin tissue, but that the same type of distortion was not found in the wound at the back; that the two wounds were connected by a path of punctures through various body tissues, indicating that an object had passed through the body directly from the abdomen through the back. There was evidence that an object, which could easily have been the bullet, struck the wall at a spot immediately behind where decedent was standing at the time she was shot, and that the mutilated bullet was found in the cushion of the chair in which appellant's brother was seated at the time the shot was fired. This bullet was so mutilated that it was impossible to make a ballistic comparison or for that matter to determine the exact caliber of the bullet; how-

ever, expert testimony was that the bullet weighed the same as a nine millimeter bullet; that it bore markings indicating that it had been fired from a gun having six lands and six grooves in its barrel with a right twist. The evidence further disclosed that the weapon which was used by the appellant was a nine millimeter weapon, and that the barrel had six lands and six grooves and a right twist.

After appellant fired the shot and before the police arrived at the home, the appellant ran across the street to the B & O railroad yard where he was hiding when arrested by the police. The police found a nine millimeter automatic pistol some three hundred feet from where they arrested appellant. Nearby they found a clip from this weapon containing several nine millimeter cartridges.

Appellant first claims the trial court erred in overruling his challenge to the array on the ground that the practice of choosing the jury panel from the list of registered voters had the factual effect of excluding Amish from the jury panel, therefore denying the appellant equal protection and due process as required by the constitution. We cannot agree with this contention.

This Court recently has been required to examine the manner in which jury panels are selected. We specifically held in *State ex rel. Brune* v. *Vanderburgh Circuit Court* (1971), 255 Ind. 505, 265 N. E. 2d 524, 24 Ind. Dec. 279, that where the trial court found that property tax lists were no longer valid as sources for jury selection in Vanderburgh County, it was proper for the court to use the voter registration lists for the purpose of calling the jury panel. Following the *Brune* case, the question was presented as to whether in Miami County the jury might be chosen from a list of property owners. See *Lake* v. *State* (1971), 257 Ind. 264, 274 N. E. 2d 249, 27 Ind. Dec. 285. In that case this Court cited the *Brune* case. This Court pointed out the practical problems faced in selecting prospective jurors and further observed that so long as this is done in a manner calculated to insure impartial

selection, the manner of choice will not be disturbed. In the *Lake* case we quoted from *Akins* v. *Texas* (1945), 325 U.S. 398, 65 S. Ct. 1276, 89 L. Ed. 1692, at pages 403 and 404 as follows:

> " '* * * The mere fact of inequality in the number selected does not in itself show discrimination. A purpose to discriminate must be present which may be proven by systematic exclusion of eligible jurymen of the proscribed race or by unequal application of the law to such an extent as to show intentional discrimination.' "

In the case at bar the appellant has not shown that he was of the Amish faith nor has he demonstrated that Amish were purposely and systematically eliminated from jury service. He does not claim that the Amish were forbidden to register to vote. In fact, he states that some five per cent are, in fact, registered to vote. The mere fact that most Amish choose, because of religious beliefs, not to participate in political elections does not mean that valid jury selection cannot be made from voter registration lists. As stated in *Lake, supra,* there must be a practical method of choosing prospective jurors. The use of lists, whether they be property taxpayers or registered voters, so long as they represent a reasonable cross section of the people of the county, cannot be said to violate the rights of the accused, in the absence of a showing that such use is made in a deliberate attempt to exclude certain groups from jury selection. No such inference may be drawn from the facts in this case. We, therefore, hold the trial court did not err in overruling the appellant's challenge to the array.

Appellant next claims the trial court erred when, during a recess, while voir dire examination was in progress, a person who had already been tentativley accepted for jury duty approached the judge and asked to be excused because of a conflicting vacation. The trial judge informed the juror that he should contact both the prosecutor and defense counsel to determine whether they were willing to excuse him. The

juror went first to the prosecuting attorney, who stated he had no objection to the release of the juror. The juror then approached defense counsel, who objected to the juror having talked to the judge and to the prosecutor in his absence. It is now the contention of the appellant that both parties were entitled to have the prospective juror serve as he had already been seated in the jury box and was subject either to challenge for cause or peremptory challenge.

We fail to see how appellant has demonstrated any prejudicial harm sufficient to warrant reversal in this case arising from this incident. The prospective juror in question did not serve, nor is there allegation that other jurors were in any way affected by this incident. The only question before us is did the appellant have a fair trial before an impartial jury. We see no way in which the incident referred to impinged upon appellant's right to a fair trial. We, therefore, hold there is no reversible error arising out of the incident.

Appellant next contends the verdict of the jury is contrary to law because the indictment charged the appellant with second degree murder alleging that he unlawfully, feloniously, purposely and maliciously, but without premeditation, did kill a human being, Betty A. Spaulding, whereas the proof presented by the State demonstrated that the appellant did not purposely kill Betty Spaulding, but that it was his intent to kill his brother, Mike; that the appellant accidently killed his mother when she stepped into the line of fire. It is appellant's position that if the State is to successfully rely on the doctrine of transferred intent that such fact must be alleged in the indictment, otherwise there is a fatal variance between the indictment and the proof. This specific point was raised in *Matthews* v. *State* (1958), 237 Ind. 677, 148 N. E. 2d 334, where the same contention was held to be without merit. Concerning such contention this Court at pages 680-681 stated:

> "*First:* Appellant asserts that the first count of the affidavit was incorrectly pleaded and the evidence is not

sufficient to sustain the conviction because the affidavit charged an assault with intent to murder Napoleon Davis, while the evidence shows that his assault was directed against one George Shipp, although, in fact, he accidentally shot Davis.

"Appellant further contends that, because the affidavit did not allege that he 'assaulted Shipp, with the intent to murder him, and inadvertently' shot Davis, there was a variance in the proof which misled him in his defense, and the trial court erred in giving appellee's Instruction No. 1 as follows:

" 'When one intends to assault a certain person with a deadly weapon, and by mistake or inadvertence assaults another person with such weapon, in the eyes of the law his intent is transferred from the person to whom it was directed to the person actually assaulted; and a person committing such an act is deemed guilty of assault with a deadly weapon, in like effect as if he had originally intended to attack the person thus assaulted through mistake or inadverence.'

"This question has been decided adversely to appellant in *Noelke* v. *State* (1938), 214 Ind. 427, 430-434, 15 N. E. 2d 950, and we see no reason to disturb the ruling in that case. The trial court did not err in giving appellee's Instruction No. 1, and appellant's complaint of the variance between the affidavit and the proof is without merit."

We, therefore, hold there was no material variance between the indictment and the proof in the case at bar.

Appellant next claims the trial court erred in permitting a public hearing on his motion to suppress evidence prior to trial. With this we do not agree. It is appellant's position that to hold such a public hearing places him in jeopardy by informing the public generally of the factual content of certain events which might well be suppressed at the trial, but by reason of public knowledge would nevertheless be in the minds of the jurors, thus prejudicing the appellant. In the first place, such an event did not happen in the case at bar. Following the hearing, the motion to suppress was, in fact, overruled, and the matter discussed at such hearing was submitted to the jury at the trial. In any

event, if evidence should be excluded on a motion to suppress, the proper procedure would be to determine on voir dire examination whether or not prospective jurors had any knowledge of such hearing and whether they had been prejudiced thereby.

In the case at bar there was no such fact established and, in fact, as above pointed out, the evidence was admitted, therefore, the possibility of such prejudice did not occur. We, therefore, hold that no reversible error occurred as a result of the public hearing on the motion to suppress.

Appellant next claims the trial court erred in overruling his motion to suppress the autopsy report for the reason that the body of the decedent had been materially altered prior to the autopsy by reason of the fact that the embalming process had been commenced. An examination of the testimony in this regard reveals that the examining physician at the hospital had determined the existence of the wound in the decedent's body and the presence of a large amount of blood in the abdominal cavity prior to the embalming or the autopsy and testified that as a result of an examination made at that time, it was the physician's opinion that death occurred as a result of internal hemorrhaging and shock caused by the inflicted wound. Further, the evidence discloses that even though the embalming process had commenced, the physician was able to determine the nature of the wound, including the severance of a large artery in the body which could not have been caused by the embalming process and which was in a direct line in the body between the entrance and exit wounds made by the bullet. The question was further raised by the appellant that plastic plugs inserted in the wounds by the emblamer so distorted those wounds that the physician should not have been permitted to testify concerning their nature. This contention by the appellant was specifically refuted by the examining physician, who testified that although the plastic plugs inserted by the emblamer had somewhat distorted the wounds, he could nevertheless make comparative

tests on the tissue from each wound from which he could draw the conclusions above referred to. The evidence presented by the State on the motion to suppress abundantly demonstrated the admissibility of the evidence notwithstanding the embalming process.

We, therefore, hold the trial court did not err in overruling the motion to suppress.

The appellant next claims the trial court erred in overruling his motion for the employment of an expert pathologist and the disinterment of the body of the decedent. Appellant makes the persuasive argument, although we know of no authority to support it in a case of this nature, that appellant should be afforded at state expense the necessary expert witnesses to formulate his defense. We observe without passing on the question that such might be true in a different factual framework, but in the case at bar where eyewitness testimony was that appellant did, in fact, shoot his mother at close range, and where the medical evidence is overwhelming that the wound so inflicted was the cause of her death, the trial judge did not abuse his discretion in finding that the circumstances did not warrant a disinterment of decedent's body and a re-examination by a second pathologist. The speculation engaged in by the appellant that the bullet may have first struck the wall and then ricocheted into the body of the decedent, is not only contrary to all reasonable inferences to be drawn from the evidence in this case, but, if true, would be immaterial in the face of the testimony as to his stated intent to kill when he fired the shot.

We, therefore, hold the trial court did not err in refusing to appoint a pathologist and order a disinterment of the decedent's body.

Appellant next claims he was denied a fair trial in that the prosecuting attorney failed to produce a statement by the State's witness, Tom Ferguson, prior to his testimony. The factual situation was that Tom Ferguson had made a state-

ment to authorities, as had many other witnesses. Appellant's counsel requested all of these statements. The request was granted. The State, in fact, furnished all of the statements, including grand jury testimony by all of its witnesses, with the exception of the statement by Tom Ferguson. The prosecuting attorney in open court explained that a diligent search had been made for the statement, but that it could not be found.

Appellant then moved for a directed verdict for the reason that Tom Ferguson had already testified before the jury. The court denied the motion for directed verdict.

Appellant then moved the court to admonish the jury to disregard the testimony of Tom Ferguson, which motion was granted, and the jury so admonished.

This Court has previously passed on the requirements of the production of statements by witnesses. *Antrobus* v. *State* (1970), 253 Ind. 420, 254 N. E. 2d 873, 20 Ind. Dec. 164. Under the *Antrobus* case, this Court held that it must be shown that the statement is probably within the control of the prosecution. In the case at bar, it was clearly demonstrated that the statement was not within the control of the prosecution. This requirement is also set out in *Witherspoon* v. *State* (1972), 258 Ind. 149, 279 N. E. 2d 543, 29 Ind. Dec. 535, and *Douglas* v. *State* (1970), 254 Ind. 324, 259 N. E. 2d 691, 22 Ind. Dec. 41.

As to appellant's motion for a directed verdict on the ground that Ferguson had already testified, such is not the proper function of the motion for a directed verdict. Such motion is in the nature of a demurrer to the evidence. It admits all facts and all reasonable inferences that can be drawn from the evidence and should not be granted if there is enough evidence to submit the facts to the jury for their determination. 28 I. L. E., *Trial* §§ 132-136. In view of the fact that the trial court did grant appellant's motion to strike the testimony of Ferguson and instructed the jury to disregard such testimony, the error, if

any, in the admission of his testimony, is cured. *Maynard v. State* (1971), 257 Ind. 336, 274 N. E. 2d 396, 27 Ind. Dec. 427.

Appellant next claims the trial court erred in admitting several exhibits, including a photograph of a gun alleged to be the appellant's gun, a photograph of the magazine from the gun, the gun itself and a mutilated bullet. It is appellant's position that the photographs were made by a defective camera or under improper conditions in that they are not examples of good photography. An examination of the photographs clearly reveals that they are far from good examples of photography. However, they do depict the objects they purport to show. There is nothing unusual or misleading, or for that matter particularly revealing, about the photographs. The quality of the photographs is such as to go merely to the weight of the evidence, rather than to its admissibility.

Appellant further claims that the photograph of the magazine was not admissible since the court did not admit the magazine. The magazine fit the gun in question and was found near the scene of the arrest. It would not have been error to admit it in evidence. Therefore, it was not error to admit the photograph.

We, therefore, hold the trial court did not err in admitting the photographs for the inspection of the jury for whatever value they might have.

The appellant claims the actual gun and the mutilated bullet should not have been introduced in evidence for the reason that they were never identified with the appellant and for the reason that when recovered, the gun had been so damaged that it could not be fired. The evidence as previously recited in this case clearly demonstrates appellant to be in error when he states the gun was not identified with the appellant. There was evidence from which the jury could find that the gun had been identified as being appellant's. There was also evidence from which the jury could conclude

that the mutilated bullet found in the chair near where decedent was shot could, in fact, have been fired by the pistol. Therefore, the court did not err in the admission of the exhibits complained of.

Appellant next claims the trial court erred in overruling his motion to correct errors wherein he raised the question that the State had exhibited certain items in full view of the jury which were never admitted into evidence. Appellant does not claim, nor do we find anywhere in this record, where he moved for a mistrial because of such conduct on the part of the State. Appellant's own recitation of the facts concerning this situation reveals that the articles so exhibited in view of the jury were, in fact, offered in evidence at various stages of the trial. However, in each instance objections stated by the appellant were sustained. In the absence of a motion to remove these exhibits from the view of the jury, a motion to admonish the jury to disregard these objects or a motion for a mistrial, the appellant is hardly in a position to claim that such a fact as shown by the record in this case would entitle him to a new trial. A very similar situation occurred in *Stearsman* v. *State* (1957), 237 Ind. 149, 143 N. E. 2d 81. In that case the Supreme Court held that the trial court did not err in overruling a motion for mistrial for the reason that they failed to make timely objections to the display of the articles and failed to request their removal from the view of the jury at the earliest opportunity. In the case at bar, the appellant did not pursue his remedy to the extent as the appellant in the *Stearsman* case. We hold that the principles of law set forth in the *Stearsman* case are applicable to the case at bar. Therefore, the trial court did not err in overruling those specifications in the motion to correct errors.

Appellant next claims the trial court erred in overruling his motion for a directed verdict at the conclusion of the

State's evidence, which motion was again renewed at the close of all the evidence. In support of this contention, appellant sets out several of the alleged errors above dealt with and, in addition thereto, claims that the State never established the identity of the defendant as George L. Taylor, nor did the State prove that if the defendant was George L. Taylor that he was the same George L. Taylor who was alleged to have committed the crime in question. We cannot agree with appellant's contention in this regard. State's witness Fred Cook specifically pointed out the defendant in the court room stating that the defendant was George L. Taylor, whom he knew. The identity question is certainly not a real issue in this case in view of the fact that the entire episode occurred in the home of appellant's mother and the actual shooting was witnessed by one of appellant's brothers and heard by one of his sisters, each of whom testified at his trial. It appears to us that in this factual setting it would be beyond the realm of reality for this Court to reverse this case for lack of identification. We hold the trial court did not err in refusing to grant a new trial upon such a contention.

Appellant next claims that the verdict of the jury was contrary to law for the reason that there was uncontradicted evidence that the appellant's state of intoxication was so great that he could not form the intent to commit second degree murder as a matter of law. With this we cannot agree. In the first place, the degree of intoxication is a matter of fact to be found by the jury. *Cody* v. *State* (1972), 259 Ind. 570, 290 N. E. 2d 38, 34 Ind. Dec. 261.

It is true that evidence in the case at bar was undisputed that appellant was intoxicated at the time he shot his mother. However, mere intoxication alone is not sufficient, but the jury must find that the intoxication is in such a degree as to render the accused incapable of entertaining a specific intent. Although the appellant in this case was intoxicated, the evidence was that he was able to

walk under his own power, that he entered the house and obtained his gun from a briefcase, went back outside where he fired shots and in some manner injured his hand; that he came back in the house, permitted his mother to doctor his injured hand, while at the same time making numerous threats toward her and other members of the family. At the time of the shooting itself, he specifically stated his intent to kill his brother. There were facts from which the jury could find that after appellant's mother placed herself between the appellant and his brother, the appellant deliberately shot his mother. After the shooting, the appellant asked his mother for forgiveness, a fact from which the jury could determine his full recognition of the act he had committed. Appellant then attempted to call an ambulance for his mother. Under the facts of this case, this Court will not disturb the finding of the jury that appellant had the mental capacity to form the intent to commit second degree murder. *Cody* v. *State, supra.*

Appellant next claims the trial court erred in giving State's Instructions 1 and 3. State's Instruction No. 1 reads as follows:

"The intent to kill can be found from the acts and declarations and the conduct of the defendant at or just immediately before the commission of the offense, and the character of the weapon used, and the part of the body on which the wound was inflicted."

The above instruction correctly states the law in Indiana. *Turner* v. *State* (1972), 259 Ind. 344, 280 N. E. 2d 621, 30 Ind. Dec. 143.

State's Instruction No. 3 reads as follows:

"Voluntary drunkeness can not justify, excuse or mitigate the commission of a crime, and the fact, if it be a fact, that the defendant may have been drunk to any degree at the time of the killing can be taken into consideration by the jury only for the purpose of determining whether the defendant, George L. Taylor, had the capacity of entertaining the specific intent charged,

where such intent is an essential ingredient of the particular crime alleged to have been committed."

State's Instruction No. 3 correctly states the law as to voluntary drunkeness as a defense. *Cody* v. *State, supra.*

We, therefore, hold the trial court did not err in giving State's Instructions Nos. 1 and 3.

Appellant next claims that the trial court erred in giving Final Instruction Nos. 2 and 2A. Court's Final Instruction No. 2 reads as follows:

"Malice may be proved by direct evidence, such as prior threats, assaults, or seeking an opportunity to perpetrate the act. This is express malice.
"Malice may also be shown by evidence that the defendant deliberately used a deadly weapon in such a way as likely to produce death. In such case, the purpose to kill may be inferred from the act of killing.

"If the jury find from the evidence, beyond a reasonable doubt, that the alleged killing was done purposely and without legal justification, excuse or reasonable provocation, then, the jury may infer malice on the part of the defendant from the intentional use of such deadly weapon in such manner as would produce death."

Court's Final Instruction No. 2 correctly states the law. *Turner* v. *State, supra.*

Court's Final Instruction No. 2A reads as follows:

"When one intends to kill a certain person with a deadly weapon, and by mistake or inadvertence kills another person with such weapon, in the eyes of the law, his intent is transferred from the person to whom it was directed to the person actually killed; and a person committing such act is deemed guilty of the crime he originally intended to commit in like effect as if he had originally intended to kill the person he actually did kill through mistake or inadvertence."

Court's Final Instruction No. 2A correctly states the law of transferred intent. See *Matthews* v. *State, supra.*

We find no reversible error in the record before us.

The trial court is, therefore, affirmed.

Arterburn, C.J., Hunter and Prentice, JJ., concur; DeBruler, J., dissents with opinon.

## DISSENTING OPINION

DEBRULER, J.—Both our Federal and State Constitutions require that jury panels reflect a cross section of the community they are drawn from. *Whitus* v. *Georgia* (1967), 385 U.S. 545, 87 S. Ct. 643, 17 L. Ed. 2d 599; *Smith* v. *Texas* (1940), 311 U.S. 128, 61 S. Ct. 164, 85 L. Ed. 84; *Dixon* v. *State* (1946), 224 Ind. 327, 67 N. E. 2d 138. This requirement places an affirmative duty on jury commissioners to prepare jury lists which do in fact reflect a cross section. *Avery* v. *Georgia* (1953), 345 U.S. 559, 73 S. Ct. 891, 97 L. Ed. 1244; *Thiel* v. *Southern Pacific* (1946), 328 U.S. 217, 66 S. Ct. 984, 90 L. Ed. 1181; *Glasser* v. *U.S.* (1942), 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680. In our opinion in *State ex rel. Brune* v. *Vanderburgh Circuit Court* (1971), 255 Ind. 505, 265 N. E. 2d 524, we held that a statutory scheme of selecting jury panels, which was fair on its face, but which in practice excluded significant numbers of the adult citizens of the county would not meet constitutional requirements, "for the reason that in Vanderburgh County the names selected from the tax duplicates and schedules would not contain a list of persons that would be a representative cross section of the citizens of Vanderburgh County." I agree with the majority that our holding *Brune* does not mandate the use of a voting list rather than a tax list. It does, however, stand for the principle that jury commissioners have an affirmative duty to compile and use a list which does indeed represent a cross section of the community.

The appellant in this case challenges the jury panel for much the same reason as the *Brune* challenge; that the list used for selection of prospective jurors does not contain a representative cross section of the county population. The

affidavit attached to appellant's challenge to the array states that there are approximately 25,000 adult persons in Daviess County of which approximately 2,000 adults are of the Amish Religion. However, the list used by the jury commissioners in that county reflected only 5% of the adult Amish names or about .4% out of about 8% of the total adult Amish population, a differential of over 7%.

These figures indicate to me that the selection procedure used by the commissioners work in their application to exclude an identifiable and substantial segment of the adult population of Daviess County and therefore appellant has made out a prima facie case of constitutional violations. *Alexander* v. *Louisiana* (1972), 92 S. Ct. 1221, (7% differential between black population and blacks on jury list); *Preston* v. *Mandeville*, 428 F. 2d 1392 (5th Cir. 1970) (15% differential between black population and blacks on master roll).

I believe that when such a prima facie showing of exclusion is made a hearing on the matter must be held and the burden then shifts to the State to rebut the presumption of unconstitutionality. *Alexander* v. *Louisiana, supra; Turner* v. *Fouche* (1970), 396 U.S. 346, 90 S. Ct. 532, 24 L. Ed. 2d 567; *Black* v. *Curb,* 464 F. 2d 165 (5th Cir. 1972); *Muniz* v. *Dato,* 434 F. 2d 697 (5th Cir. 1970). The State's burden would not be met merely by asserting that the list used is neutral on its face or that the commissioners' use of that list was not in any way designed to exclude an identifiable group of the community from the jury panel. A selection of a jury list which in its application excludes an identifiable group, whether unintentionally or intentionally, fails to meet constitutional standards. *Jones* v. *Georgia* (1967), 389 U.S. 24, 88 S. Ct. 4, 19 L. Ed. 2d 25; *Smith* v. *Texas, supra.* The Constitution mandates affirmative duties of jury commissioners which must be carried out to insure a constitutionally secure system. *Avery* v. *Georgia, supra.* The fact that jury commissioners have acted in good faith is not a defense to the failure to discharge the affirmative constitutional duty to

provide and use a list which reflects a cross section of the community. *Salary* v. *Wilson,* 415 F. 2d 467 (5th Cir. 1969).

Nor do I believe, as the majority seems to imply, that appellant's standing to object to the array rests on his being a member of that group which is being excluded. It matters not whether a defendant in a trial is a member of a group which is being excluded from a jury list. The crux is that a defendant has a constitutionally protected right to a cross section of the community on his jury list and when the list used fails to provide that cross section his standing, as a defendant, is established.

I should also point out that there exists no conflict between any First Amendment rights of the Amish and the duty to include their names on jury lists. Any such conflict would arise only on their being selected as jurors for a case. At that point the judicially recognized religious beliefs of the individual Amish may allow him to be excused from his obligation. *Wisconsin* v. *Yoder* (1972), 92 S. Ct. 1526. However these instances must be based on individual information and circumstances and may not be grounded in the assumed beliefs of an entire group.

I would hold this appeal in abeyance and remand to the trial court for a hearing to afford the State an opportunity to rebut the presumption of unconstitutionality raised by appellant's challenge to the array.

NOTE.—Reported in 295 N. E. 2d 600.