Martin R. BRYAN, Appellant,

v.

STATE of Indiana, Appellee.

No. 281S48.

Supreme Court of Indiana.

Aug. 11, 1982.
Rehearing Denied Nov. 3, 1982.

James V. Tsoutsouris, Public Defender of Porter County, John F. Hoehner, Chief Deputy Public Defender, Valparaiso, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-appellant, Martin Bryan, was convicted of Attempted Murder, Ind.Code § 35-41-5-1 (Burns Repl.1979) and Ind. Code § 35-42-1-1 (Burns Repl.1979), Rape, Ind.Code § 35-42-4-1 (Burns Repl.1979), and Confinement, Ind.Code § 35-42-3-3 (Burns Supp.1982), by a jury in Porter Superior Court on October 2, 1980. He was sentenced on October 10, 1980, to forty-five (45) years for attempted murder, twenty (20) years for rape, and four (4) years for confinement. All sentences are to run concurrently. Bryan now appeals.

Defendant raises five errors on appeal, concerning: (1) whether the trial court followed the proper procedure in determining the defendant's competency to stand trial; (2) whether the trial court abused its discretion in overruling defendant's pre-trial motions for continuances; (3) whether defendant's *Miranda* rights were violated by the taking of both a tape recorded and video recorded statement from defendant; (4) whether the selection of the jury was proper and in compliance with the statute; and (5) whether defendant's sentence was manifestly unreasonable. Defendant raised an additional issue concerning an instruction defining attempted involuntary manslaughter, but in his reply brief defendant concedes, in light of *Smith v. State*, (1981) Ind., 422 N.E.2d 1179, where we held that there can be no crime of "attempted involuntary manslaughter," that he was not entitled to the requested jury instruction.

M.B., the victim, was working as a clerk in a 7-11 Store in Porter County, Indiana. On May 6, 1980, she went to her job. About 2:00 a. m., on May 7, 1980, a man grabbed her by the neck. She had seen him earlier, around midnight, when there were other people in the store. M.B. described the man and said the lighting was very good. She identified defendant, Martin Bryan, as this man.

M.B. tried to get free. Defendant said he had a gun and would kill her, asked if she had a car and said they would go for a ride. She got her keys while he still held her by the neck. He told her he was going to get a "quick piece of ass." Defendant forced her into the car and drove off. She tried to escape and fought with him. He put her in the driver's seat, placed something against her body and said it was a knife. He forced her to turn off and stop on a gravel road and to remove her lower garments and get into the back seat by threatening to kill her. M.B. testified that due to his threats she submitted to sexual intercourse. He performed cunnilingus and forced her to perform fellatio twice. He again forced her to submit to sexual intercourse. After she dressed, he choked her, rendering her unconscious for a brief time. He then drove around with her and while driving forced her to masturbate him and made her undress again. He stopped at a rest park and again forced her to submit to oral sex and intercourse.

Bryan expressed some worry about what she would say to the police. At a rest park he opened the trunk of her car, threw out various items that were in it, made M.B. get into the trunk and closed it. He then returned to the trunk, opened it, asked if she could breathe and when she said yes, he asked her to tell him where he could cut her throat to kill her. He took a knife which was on her key chain and cut her neck and wrist, causing bleeding and leaving scars. She went limp in order to make him think she had passed out. He cut her some more then locked her in the trunk again. Later he looked in the trunk, poked her and said, "Oh God, she's dead."

Defendant then drove the car around. The victim could tell from the sound that he pulled off on a gravel road and then onto a rough surface. She heard branches hitting the car. Bryan opened the trunk, poked M.B., tried to take her pulse and lifted her eyelid, then locked her in the trunk again. M.B. heard no sounds around the car. After it was silent for a while, M.B. tried to escape. She finally succeeded by kicking out the back seat of the car. She emerged

to find her car in a ditch in a field near a trailer park and a farm house. A woman in the farm house helped her to wash off some of the blood and called the police, who took her to a hospital in Valparaiso. M. B. suffered several long cuts on her neck, bruises all over her left side, a welt on her arm, scratches on her back, bruises on her chest and a swollen throat. By the time of trial she still had numbness in the inside of some fingers and in her thumb.

Detective Sergeant Wayne A. Kempher, LaPorte County Sheriff's Department, tracked moccasin footprints in soft dirt from the car to a trailer park. Along the way he found a 7–11 Store smock. After obtaining a warrant for a trailer where the footprints stopped he found inside it clothes being washed, matching the description given by M. B. of the clothes her assailant was wearing. Bryan was arrested by Sheriff Jan Rose, who found him in bed. Rose read Bryan his rights and saw him execute a written notice of rights.

I

Defendant Bryan claims the trial court erred in failing to follow the provisions of Ind.Code § 35–5–3.1–1 (Burns Repl.1979) which prescribe the procedure to be followed to determine a criminal defendant's competency to stand trial. Defendant specifically alleges that the court failed to appoint two disinterested psychiatrists to examine him, and also that the trial court should have determined defendant's competency prior to trial.

Ind.Code § 35–5–3.1–1(a) reads as follows:

"If at any time before the final submission of any criminal case to the court or jury trying the same, the court, either from its own knowledge or upon the suggestion of any person, has reasonable grounds for believing that the defendant lacks the ability to understand the proceedings and assist in the preparation of his defense, the court shall immediately fix a time for a hearing to determine whether the defendant has that ability. The court shall appoint two [2] competent disinterested psychiatrists, who shall examine the defendant for the purpose of forming an opinion as to whether the defendant has that ability and shall testify concerning the same at the hearing." [Repealed by Acts 1981, P.L. 298, § 9, effective September 1, 1982]

Defense counsel filed a Motion to Determine Competency on September 11, 1980, two weeks before the proposed start of defendant's trial. The following day, September 12, the trial court appointed Drs. Hansen, Hogle, and Berkson to examine defendant Bryan and also set a hearing date to determine competency on September 18. Upon learning that Dr. Hogle was on vacation, the trial court stated that he would not have to examine the defendant.

At the hearing on September 18, Dr. Nicolas Hansen was sworn and examined. Dr. Hansen testified, under the trial court's examination, that in his opinion "he [defendant Bryan] was competent; that he did understand the charges against him and that he would be able to cooperate with his attorney in preparing and conducting his own defense." Under cross-examination by defense counsel, Dr. Hansen stated that he had a B.A. and M.D. degree from Wayne State University. He also stated that he was Board Certified by the American Board of Family Practice and was a Fellow of the American College of Family Physicians. In the past, Dr. Hansen had testified both in Porter and Lake County courts in over 50 cases. Although he stated he was not a psychiatrist, half of Dr. Hansen's practice dealt with psychiatric related problems.

Dr. Berkson, a psychiatrist, testified that he did not consider Bryan competent to stand trial. His reasons were that Bryan did not actively cooperate with counsel, had unreasonable expectations of his attorney and persisted in a false belief that one of the three charges, confinement, was dropped. When questioned, Dr. Berkson stated that Bryan was not at a "disability to cooperate" with counsel, but was "basically refusing" to cooperate. The court found defendant competent, but appointed Dr. Batacan, another psychiatrist, to con-

duct a further competency examination and to report back to the court. The trial court stated its ruling was subject to change and that if change occurred during trial he would declare a mistrial. Dr. Batacan testified, after both sides rested but before submission of the cause to the jury, that Bryan was competent.

We find no error in the trial court's actions here. We stated in *Adams v. State*, (1979) Ind., 386 N.E.2d 657, 659:

"The right to a competency hearing is not absolute and the mere appointment of two physicians to examine a defendant does not automatically invoke the statutory procedure set out in Ind.Code § 35–5–3.1–1. *Montague v. State*, (1977) Ind. [266 Ind. 51], 360 N.E.2d 181; *Brown v. State*, (1976) 264 Ind. 484, 346 N.E.2d 559. The statute and due process considerations only require that a hearing take place where the evidence before the court raises a bona fide or reasonable doubt as to the defendant's sanity. *Pate v. Robinson*, (1966) 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815; *Cook v. State*, (1972) 258 Ind. 667, 284 N.E.2d 81."

However, once that doubt arises the trial court must follow the dictates of § 35–5–3.1–1. The legislature amended the statute in 1978, changing the required physicians to psychiatrists. We feel it was the legislature's clear intent that at least two psychiatrists examine the defendant. In this situation, two psychiatrists, Drs. Berkson and Batacan, did examine the defendant, although they did not testify at the same hearing. Dr. Hogle, another psychiatrist, had been appointed to examine defendant but was unable to do so because he was on vacation. The determination of competency must be made before the "final submission of any criminal case to the court or jury trying the same, . . . ." The court ruled here that it felt the defendant was competent after hearing testimony from Drs. Hansen and Berkson, but that its ruling was subject to change and if a change occurred it would declare a mistrial. At that time, the trial court appointed another psychiatrist to examine the defendant and

report back to the court. If a defendant is found incompetent during trial, the court may declare a mistrial *sua sponte* without jeopardy attaching. *Wilson v. State*, (1976) 169 Ind.App. 297, 299–300, 348 N.E.2d 90, 92. Here, given the late date of defendant's suggestion of incompetence and the unexpected absence of one psychiatrist, the court properly made an interim ruling and called for the additional evidence required by statute, receiving the same within the time permitted. In addition, paragraph (b) of § 35–5–3.1–1 allows other evidence, if relevant, to determine competency. Trial courts are not limited to only two psychiatric opinions. Therefore, Dr. Hansen's testimony was properly allowed at the hearing. There is no trial court error here.

## II

Defendant Bryan contends that the trial court erred in its failure to grant defendant's motion for continuance. The relevant facts pertaining to this assignment of error are as follows: pauper counsel appeared on May 9, 1980, for defendant and on June 5, 1980, filed notice of an insanity defense. The case was set for trial on August 20, 1980. On August 15, defendant discharged the public defender and retained private counsel, who moved for a continuance so he could obtain time to review all discovery materials and familiarize himself with this matter. The court reset the trial for September 24. On September 11, counsel for defendant filed another motion for continuance alleging again that he did not have enough time to familiarize himself with the case. On September 17, 1980, counsel filed a supplemental motion for continuance, together with an affidavit from Dr. Brogno, which stated that he would not have time to examine and evaluate defendant before the proposed start of trial. This is the only matter of absence of evidence alleged in any motions to continue the trial from September 24. All the other grounds were non-statutory. The court granted the motion, continuing trial to September 29.

No motion was filed within the five-day limit, Ind.Code § 35–1–26–1 (Burns Repl.

1979), to continue the September 29 trial setting. On September 29, counsel filed a motion for continuance, alleging a need to confer with Dr. Brogno and prepare the insanity defense. The trial court denied the motion and the trial proceeded.

Ind.Code § 35–1–26–1 and Ind.R.Tr.P. 53.4 govern the granting of continuances based upon the absence of evidence or witnesses, two statutory grounds for continuances. § 35–1–26–1 reads in relevant part: "A motion by the defendant to postpone the trial on account of the absence of evidence can be made only on affidavit showing materiality of the evidence expected to be obtained, and that due diligence has been used to obtain it, and where the evidence may be . . ." [repealed effective September 1, 1982].

■ A motion for continuance based upon non-statutory grounds, such as an alleged need to have more time for trial preparation, is addressed to the trial court's discretion. *Drollinger v. State*, (1980) Ind., 408 N.E.2d 1228, 1231; *Hemphill v. State*, (1979) 387 N.E.2d 1324, 1326. However, granting continuances in order to allow more time for preparation is generally not favored without a showing of good cause and will only be granted in the furtherance of justice. *Miller v. State*, (1978) 267 Ind. 635, 638, 372 N.E.2d 1168, 1170; *Carlin v. State*, (1970) 254 Ind. 332, 335, 259 N.E.2d 870, 872. Whether good cause has been shown rests within the sound discretion of the trial judge and will be disturbed only if there is a clear showing of an abuse of discretion. *Miller v. State*, (1971) 256 Ind. 296, 268 N.E.2d 299; *Jay v. State*, (1965) 246 Ind. 534, 206 N.E.2d 128. In determining whether good cause exists, the trial judge may look to the circumstances of the case as well as the allegations of the motion and is not required to grant the motion simply because it complied with Ind.R.Tr.P. 53.4. *Miller v. State*, (1978) 267 Ind. 635, 372 N.E.2d 1168; *Hooks v. State*, (1977) 266 Ind. 678, 366 N.E.2d 645.

■ The record shows that all motions for continuance were granted except for the one filed on the day of trial, September 29, 1980. § 35–1–26–1 states: "The defendant shall file such affidavit for continuance at least five [5] days before the date set for trial or shall sustain the burden of establishing to the satisfaction of the court, that the defendant is not at fault for failing to file such affidavit for continuance at an earlier date." We feel that the trial court did not abuse its discretion in denying the motion for continuance. Defendant has failed to show why he was unable with due diligence to obtain the psychiatric evaluation in the four months since his arrest, the three months since filing notice of an insanity defense, or the six weeks since the appearance of new counsel. In addition, the record shows that Dr. Brogno testified about defendant's sanity and was ably questioned by counsel. Therefore, we fail to see how defendant was prejudiced by the trial court's denial of continuance. There is no trial court error here.

### III

■ Defendant claims that statements given to the police were inadmissible. He argues that he did not knowingly and intelligently waive his rights under *Miranda v. Arizona*, (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The statements which defendant sought to suppress and which were admitted into evidence over defense objection were State's Exhibit 20, a tape recorded statement given by defendant on May 7, 1980, and State's Exhibit 21, a video recorded statement given by defendant on May 7, 1980. A Motion to Suppress and Reject Confessions was filed and a hearing was held on September 5, 1980. The motion to suppress was denied.

This Court stated in *Harrison v. State*, (1978) 269 Ind. 677, 682, 382 N.E.2d 920, 923–24:

"The question of the admissibility of a confession is controlled by determining from the totality of circumstances, whether or not it was made voluntarily. The circumstances to be considered include whether the confession was freely self-determined, the product of a rational intellect and free will, without compul-

sion or inducement, and whether the accused's will was overborne. *Murphy v. State*, (1977) 267 Ind. 184, 190, 369 N.E.2d 411, 415. We review the question on appeal as we do other sufficiency matters. We do not weigh the evidence, but rather determine whether there was substantial probative evidence to support the trial court's finding. *Works v. State*, (1977) 266 Ind. 250, 362 N.E.2d 144. We will not disturb a trial court's ruling on the admissibility of a confession when such ruling is based on substantial, though conflicting evidence. *Riggs v. State*, (1976) 264 Ind. 263, 270, 342 N.E.2d 838, 843."

The main issue involved in defendant's claim is his contention that he was questioned after requesting an attorney. During the questioning, done by Sheriff Jan Rose and Detective William Woods, Bryan admitted essentially the same facts as were set out above in the opinion. At the beginning of defendant's tape recorded statement, after Sheriff Rose read defendant his constitutional rights, Rose asked, "Is there any question as to your legal rights, Martin?" and the following exchange took place:

[BRYAN]: No, but I think I'm gonna need a lawyer.

[ROSE]: Ok, you don't want to talk to us.

A: I'll talk to you, but I'm still gonna need a lawyer.

Q: Ok, I can appreciate that, well I thank you for that, now do you want a lawyer before we ask you questions?

Rather than answer whether he wanted an attorney, defendant asked what the charges were and there was some discussion about this. Rose started questioning defendant about the abduction from the 7–11 Store and, still early in the statement, asked:

Q: Ok, so basically, in otherwords (sic) you're admitting that you abducted her from the store, is that correct?

A: Yea.

Q: Ok, do you want an attorney here?

A: Yea.

Q: You do want an attorney.

A: Yea, I sure do.

Q: Ok, you understand that I can't ask you any more questions.

A: That's right, I want an attorney

---

At this point the tape recorder was shut off and a discussion took place between the two policemen and defendant. The machine was turned on within a few minutes.

Q: Ok, Martin, you just said that you want an attorney, does that mean you want an attorney right now?

A: I'm very confused, see, I don't want, I did it, I'm telling you I did it, you know what I'm talking about.

Q: I can appreciate that.

A: Before we turn that on, I tell you like, I did it, ok, I'm very confused, I've never done noting (sic) like this before, I know I should give you a statement because there's no way I can hide it, and if I hide it I'll just get more time or it'll just take longer and I know I need a lawyer, I just don't want to mess up now and anything I say that could get me more time or anything like that, do you understand what I'm saying?

Q: Oh yea, I appreciate that.

A: Ok, so we'll (sic) talk, I'll give you a statement and then I'll see a lawyer.

Q: Ok, so basically what you're telling me now is you want to give me a statement into the case and then you want an attorney.

A: Yes.

During the suppression hearing, defendant testified that he gave a statement without the presence of an attorney because Sheriff Rose made it clear to him that a statement would have to be given first and then he would be given an attorney. Sheriff Rose and Detective Woods both denied making any threats. On cross-examination by Mr. Steele, the following testimony was elicited from the defendant:

Q Isn't it true, Mr. Bryan, that after you requested an attorney Sheriff Rose almost immediately turned that tape machine off?

A Correct.

Q He advised you at that point something to the effect, Marty, if you do request an attorney, I cannot talk to you anymore at this time?

A Correct.

Q Isn't it true at that point you indicated to him that you wanted to talk to the police officer but you did want an attorney later on in the court proceedings?

A Yes, sir.

Q Isn't it true that Sheriff Rose then said, okay, you do want to talk to us now and want an attorney later, something to that effect?

A Yeah.

Q At that point did he not return the tape machine on?

A I think so, yeah.

Q And right on the taped statement did he not indicate, Marty, "You want to talk to us now and you want an attorney later"?

A Right.

Q Did you not answer "Yes"?

A Yes.

Q Then you gave a statement concerning the events involved in this particular incident, correct?

A Yes.

Q And at the end of that statement Sheriff Rose again advised you concerning your rights and gave you a waiver form to sign?

Now hand you what's been marked as State's Exhibit Two and you had an opportunity to sign that?

A Yes.

Q Subsequent to this, Mr. Bryan, you had an opportunity to have some coffee and even go to the bathroom, is that not correct?

A Yes.

Q If I can backtrack for a moment; initially in the same room were Sheriff Rose, Detective Woods and yourself, right?

A Yes.

Q And during the course of the tape-recording statement Detective Woods was present, is that not correct?

A Yeah, I believe so.

Q Now, after you had gone to the bathroom and had a cup of coffee an audiovisual type statement was taken?

A Right

Q Isn't it true that prior to any questions concerning the incident you were again read all your constitutional rights, handed a waiver form which you read over and signed?

A That's right.

Q Now hand you what's been introduced in evidence as State's Exhibit Three. Is that not, in fact, a copy of the waiver that you were advised of, read over and signed?

A That's right.

Q And in addition, Mr. Bryan, after this waiver was read to you, after you had a chance to read it and sign it, before any questions concerning the incident, were you not again on the tape specifically asked the question something to the effect, you want to talk to us now and want an attorney later, is that not correct?

A Yes.

Q And you proceeded to give a statement concerning the incident involved?

A That's correct.

Q And isn't it true towards the end of that audiovisual tape-recording you were again asked the question, Did you want an attorney when you gave us these particular statements, and you made the answer, No, I want to talk to one later but as of right now, no; I'll let you know I did it, something to that effect?

A  That's right.

Q  You were very willing to give them a statement voluntarily of your own free will?

A  (Indicating).

Sheriff Rose and Detective Woods testified that no questioning took place until defendant was placed in jail. In fact, Rose said defendant started to make a statement in the trailer where he was arrested but Rose advised him to wait until he was taken to the Sheriff's office. Detective Woods testified that five to ten minutes after defendant was read his rights and signed a waiver form, Bryan was transferred to the LaPorte County Sheriff's office. Woods also said the transcript of defendant's statement was accurate. The following testimony was taken from Woods:

Q  Is there a point on this particular statement where the tape was turned off, although it may not be indicated on the transcript itself?

A  Yes, there is.

Q  I believe you're indicating to me there were some questions to the effect that the defendant was asked, "Q Okay, so basically, in other words, you're admitting that you abducted her from the store, is that correct?" And the defendant made an answer, "Yeah." "Q Okay, do you want an attorney here? A Yeah, I sure do. Q Okay. You understand that I can't ask you any more questions? A That's right, I want an attorney—"

On this transcript there's a line that indicates there isn't anything there. At what point was the tape-recorder turned off?

A  After the word "attorney" in the sentence of the answer "That's right, I want an attorney."

Q  Okay. What occurred right after the tape-recording or tape machine was turned off?

A  As soon as Sheriff Rose turned the tape-recorder off we sat back in our chair and said nothing, it was over.

Q  Did there come a time that the defendant said something to Sheriff Rose?

A  Defendant said something to Sheriff Rose.

Q  What did he say?

A  It was phrased to the effect of what happened, why did we stop.

Q  What did Sheriff Rose say to him?

A  He said, "Marty, you said you wanted an attorney, we can't ask you any more questions."

Q  What did Marty say to you?

A  His phrase was to the effect well, I want an attorney to defend me but I want to tell you what happened.

Q  What happened after that?

A  Sheriff Rose asked him if he wanted to go ahead with the statement, go ahead with the recording. He said, "Yes."

Q  What happened after that?

A  I believe Sheriff Rose offered him a cigarette or Marty asked the Sheriff if he could have a cigarette and at that point turned the tape-recorder back on.

Q  Do you recall reviewing the tape-recording itself, what the statement is after you cut it off?

A  Yes. There's an inaudible sentence where the tape-recorder came back on. When I listened to it, I could understand the sentence by Marty of "I don't know if they took mine off the trailer or not" and this is in reference to his cigarettes.

Q  Then, as the transcript shows, before any questions at all were asked of the incident it was reaffirmed with Mr. Bryan—Strike that.

Before you talked about the incident at all he indicated to you he wanted to talk to you; he wanted to talk to an attorney later but at that point he was willing to give you a statement?

A  Correct.

Q  At any point in your contact with him at all on that date did you threaten, coerce, promise the defendant anything?

A  No.

The testimony at the hearing was conflicting but we feel the trial court did not err in denying the motion to suppress the confessions. Defendant's testimony indicates, although he says at one point that he was confused, that he understood his rights and wanted to make a statement without an attorney present. Throughout the questioning he was asked on several occasions whether he wanted an attorney and he said no. The only evidence of threats were from defendant, yet later in his tape recorded statement he says, "And you guys are talking to me in a nice way, you should all be jumping down my shit, giving me the third degree...." It appears that defendant exercised his free will and voluntarily and knowingly made the confession. There was substantial probative evidence to support the trial court's ruling. *Works, supra.*

### IV

Defendant argues the selection of jurors in Porter County is improper and unconstitutional. The practice in Porter County has been to exclusively use the property tax rolls, not voter registration lists, to select prospective veniremen. A Motion for Special Venire was filed on September 11, 1980. A hearing on the motion was held on September 18, at which time the motion was denied.

This issue involving selection of Porter County jurors was raised in *Daniels v. State*, (1980) Ind., 408 N.E.2d 1244. Speaking for the Court, Justice Hunter wrote:

"Furthermore, this Court has held that the use of a list of property taxpayers which represented a reasonable cross-section of the county did not violate the rights of the accused, in the absence of a showing that the use of the list was a deliberate attempt to exclude certain groups from jury selection. *Morris v. State, supra; Taylor v. State,* (1973) 260 Ind. 264, 295 N.E.2d 600, *cert. denied* 414 U.S. 1012, 94 S.Ct. 377, 38 L.Ed.2d 250. We have consistently held that jury selection systems are required to draw prospective jurors from a fair cross-section of the community and the burden of dem-

onstrating purposeful discrimination is on defendant. *Burr v. State*, (1980) Ind., 403 N.E.2d 343; *Holt v. State*, (1977) 266 Ind. 586, 365 N.E.2d 1209. Jurors need not be mathematically proportioned to the character of the community and there is no requirement that any particular class be represented on every jury. *Burr v. State, supra; Tewell v. State,* (1976) 264 Ind. 88, 339 N.E.2d 792."

*Id.,* 408 N.E.2d at 1247.

Defendant has not shown any deliberate attempt to exclude any group from jury selection. Therefore, the trial court did not err in denying the Motion for Special Venire.

### V

Finally, defendant contends that his sentence was manifestly unreasonable in light of the nature of the offense and character of the defendant. The trial court gave defendant 45 years for attempted murder, 20 years for rape, and 4 years for confinement. All of these sentences were increased from their statutory amounts because of aggravating factors. Defendant alleges that the trial court ignored mitigating evidence introduced at trial.

Ind.R.App.Rev.Sen. 2(2) states: "A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and offender for which such sentence was imposed." At the sentencing hearing, the trial court looked at the presentence report and stated the following:

"The Court specifically finds that there is nearly a complete absence of mitigating circumstances. I looked at the Statute, I failed to find any. The Court specifically finds that the defendant has had antisocial delinquency, so to speak, for a period of a good number of years. Court specifically finds that he is in need of correctional or rehabilitative treatment, best provided by commitment; that the nature and circumstances of crimes committed by this defendant were of a very aggravating nature. I specifically find that the imposition of any re-

duced sentence would gravely depreciate the seriousness of these three crimes."

Due to the facts of this case, in which a young woman was abducted, raped in two locations, cut with a knife, and locked in the trunk of her car before defendant ditched her automobile, we do not find the sentence to be too severe. We will not alter a sentence set by the trial judge if it is within statutory bounds unless it appears it is manifestly unreasonable. *Vacendak v. State*, (1981) Ind., 431 N.E.2d 100, 106. There is no showing that the sentence imposed here was manifestly unreasonable and we, therefore, will not interfere with the judgment of the trial judge.

The judgment of the trial court is affirmed.

GIVAN, C. J., concurs.

DeBRULER, J., concurs in Issues I, II, IV, and V, but dissents to Issue III with separate opinion in which HUNTER, J., concurs.

PRENTICE, J., dissents, with separate opinion, to Issue I.

DeBRULER, Justice, dissenting.

I concur in parts I, II, IV and V of the majority opinion, but dissent to the majority decision as to issue III and would reverse for a new trial.

The legal approach taken in the majority opinion in resolving in part III the question of the admissibility of appellant's confession is faulty. It is critical to keep separate in this case the distinction between the question of waiver of rights and the question of whether the confession was voluntary, and omitting to do so here has led to a wrong decision. The two questions are clearly related. The court *may* focus on exactly the same set of basic facts in resolving the two questions, *Magley v. State*, (1975) 263 Ind. 618, 335 N.E.2d 811, and the waiver standard includes the application of the traditional voluntariness standard. *Nacoff v. State*, (1971) 256 Ind. 97, 267 N.E.2d 165. They are, however, discrete. The waiver standard, "an intentional relinquishment or

abandonment of a known right or privilege", *Johnson v. Zerbst*, (1938) 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, provides a special heightened form of protection for specific constitutional rights, not provided by the voluntariness standard. That additional protection comes from the requirement that special attention be given to the extent of the parties' knowledge. *Schneckloth v. Bustamonte*, (1973) 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. While considering the basic facts in this case from which one could determine the extent of appellant's knowledge of his right to counsel, the majority nevertheless quotes the voluntariness standard from *Harrison v. State*, (1978) 269 Ind. 677, 382 N.E.2d 920, and concludes only that the evidence was sufficient to warrant the determination "that defendant exercised his free will and voluntarily and knowingly made the confession." This is federal constitutional error.

The rendition of the record in the majority opinion is excellent and reveals that the salient facts are without conflict and lead to but one rational conclusion, and it is that appellant's confession was obtained in violation of the rights guaranteed appellant in *Miranda v. Arizona*, (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The case on appeal resembles the recent case of *Edwards v. Arizona*, (1981) 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, wherein the accused made a waiver of *Miranda* rights and was subjected to interrogation up to the point when he invoked the right to counsel. The interrogation was stopped. The next day, however, without making counsel available to him, they returned to him, read him his *Miranda* rights again. He responded by saying that he wanted to talk to them. He then made an incriminating statement which the Supreme Court held was inadmissible because it had not been preceded by a voluntary waiver of counsel. The court noted that he was given an advisement of rights anew and that the resumption of interrogation on the second day had not been suggested or requested by Edwards.

The tape-recorded confession in the case on appeal reflects an unequivocal and totally clear invocation by appellant of his rights to counsel, when he, on the *second occasion* on which he asked his interrogators for the advice and presence of a lawyer during interrogation, engaged in the following dialogue:

"Q. O.K., do you want an attorney here?

A. Yea.

Q. You do want an attorney.

A. Yea, I sure do.

Q. O.K., you understand that I can't ask you any more questions?

A. That's right, I want an attorney_____."

It is established by the witnesses including the interrogators, and stands uncontradicted, that the recording machine was turned off at this point. The officers testified that they could not continue questioning him because he had asked to have a lawyer present. It was done in respect for appellant's *Miranda* rights. This break in interrogation is equivalent for the purpose of legal analysis to the break in interrogation which occurred in *Edwards*. The issue here, as in *Edwards*, is whether the State carried its burden of proving that appellant waived his right to counsel between the request for counsel and the resumption of interrogation.

According to the record the break in interrogation only lasted for a few minutes. Sheriff Rose testified:

"Q. Did there come a point when you turned the tape-recording off?

A. Yes.

Q. When was that?

A. After we had started into the statement we read his rights to him again. We started into it and then he made a statement of I want an attorney and like stop, like right now. He wanted it now. So I reached over and turned off the tape-recorder.

Q. What happened at that point?

A. He was like puzzled for a second, like why did you shut off the tape-recorder. I explained to him that I could

no longer talk to him because he wanted an attorney right now. *He advised no, you don't understand; I want to talk to you. I want to discuss this but I want my attorney later when I go to court.*

Q. Did you eventually turn the tape machine on?

A. Yes, I did. He was fidgeting around, he asked me for a cigarette. In the process of taking one cigarette I turned the tape-recording back on.

Q. When that was on, did you make sure he wanted to talk to you now and he would talk to an attorney later?

A. That's correct." (Emphasis added.)

With regard to this same period of time Detective Woods testified:

"Q. And was the tape-recorder turned off at any time during that statement?

A. Yes, it was.

Q. And was it turned off during the questioning when the defendant was requesting an attorney?

A. It was turned off at a point right after he made a request for an attorney.

Q. And after it was turned off did either you or Sheriff Rose go to a phone or do anything to get him an attorney?

A. No. We remained seated at the desk.

Q. When the tape was turned off, you and Sheriff Rose continued to ask the defendant are you sure you want an attorney, correct?

A. No. When the tape was turned off, that was it.

Q. You didn't ask anything else?

A. We had ended it.

Q. How long was that turned off?

A. Less than two minutes.

\*    \*    \*    \*    \*    \*

Q. Okay. What occurred right after the tape-recording or tape machine was turned off?

A. As soon as Sheriff Rose turned the tape-recorder off we sat back in our chair and said nothing, it was over.

Q. Did there come a time that the defendant said something to Sheriff Rose?

A. Defendant said something to Sheriff Rose.

Q. What did he say?

A. It was phrased to the effect of what happened, why did we stop.

Q. What did Sheriff Rose say to him?

A. He said, 'Marty, you said you wanted an attorney, we can't ask you any more questions.'

Q. What did Marty say to you?

A. His phrase was to the effect well, *I want an attorney to defend me but I want to tell you what happened.*

Q. What happened after that?

A. Sheriff Rose asked him if he wanted to go ahead with the statement, go ahead with the recording. He said, 'Yes.'

Q. What happened after that?

A. I believe Sheriff Rose offered him a cigarette or Marty asked the Sheriff if he could have a cigarette and at that point turned the tape-recorder back on." (Emphasis added.)

The tape recording recommences with the following:

"Q. Ok, Martin, you just said that you want an attorney, does that mean you want an attorney right now?

A. I'm very confused, see, I don't want, I did it, I'm telling you I did it, you know what I'm talking about.

Q. I can appreciate that.

A. Before we turn that on, I tell you like, I did it, ok, I'm very confused, I've never done nothing like this before, I know I should give you a statement because there's no way I can hide it, and if I hide it I'll just get more time or it'll just take longer and *I know I need a lawyer, I just don't want to mess up now and anything I say that could get me more time or anything like that, do you understand what I'm saying.*

Q. Oh yea, I appreciate that.

A. Ok, so we'll talk, I'll give you a statement and then I'll see a lawyer.

Q. Ok, so basically what you're telling me now is you want to give me a statement into the case and then you want an attorney.

A. Yes." (Emphasis added.)

Again, the question to be resolved by this Court in this jurisdiction is whether by these basic facts, the State presented evidence which would convince a reasonable trier of fact beyond a reasonable doubt, that appellant waived his right to counsel, i.e., that he understood that right and intelligently and knowingly relinquished it. There are several reasons why my judicial response must be a resounding, no. First and foremost, appellant, at no point, states that he does not want counsel during interrogation. He says that he wants to make a statement now. He says that he wants a lawyer for his defense at trial. But at no point does he come around to saying that he does not want a lawyer for interrogation. Indeed, to the very end of this scene he maintains that he wants a lawyer, needs a lawyer, to keep from "messing up" and producing evidence or a sentence which is not deserved. Moreover, by the end of this scene he has become confused as to the scope of the right to counsel. The right is no longer a known one. At the outset of the taped session he was expressly advised that he had the right to the presence and advice of counsel during *questioning.* When he first stated "No, but I think I'm going to need a lawyer", the response by the interrogator, "Ok, you don't want to talk to us", carried the unfair suggestion that he could not at the same time claim the right to counsel and the privilege to make a statement. This suggestion modified the former advice of the right to counsel, and was misleading and confusing. And finally, I cannot help but read this entire colloquy as showing resignation by appellant rather than relinquishment. The confession was given without the aid and

assistance of counsel, and without a constitutionally valid precedent waiver of counsel and was inadmissible.

I would remand for a new trial to be conducted without the introduction of the tape recorded statement or the subsequent video taped statement.

HUNTER, J., concurs.

PRENTICE, Justice, dissenting.

I dissent to the majority decision as to Issue I and would remand the cause with orders to vacate the verdict and proceed anew with a determination of Defendant's competency to stand trial. It is clear that the trial court had reasonable grounds for believing that Defendant lacked the ability to understand the proceedings and assist in the preparation of his defense. Otherwise he would not have set a hearing to determine the issue. Having determined that the circumstances invoked the statute, Ind. Code § 35–5–3.1–1, the court was bound to proceed in accordance with its provisions. This, he started out to do, but when it appeared that such proceedings could not be completed without occasioning a delay in the trial, the competency proceedings were "short circuited."

Paragraph (b) of the statute provides that the trial will proceed, if the court determines that the defendant has the requisite ability but that it will be delayed, if it finds that defendant does not have such ability. Inherent in the statute is the requirement that the competence hearing precede the trial—not that trial may precede the hearing. It is also inherent in the statute that the competency determination be made at the conclusion of the hearing—not prior to it or in the middle of it. I do not find it significant that the trial court announced that he would declare a mistrial in the event that he changed his mind during the course of the trial. This, he would be required to do in any event.

Although we may assume that nothing occurred, during the trial or upon hearing the testimony of the belatedly appointed Dr. Batacan, that reflected substantially and adversely as to Defendant's competence and that a remand is, therefore, a waste of judicial time, effort and money, in my view there could be no trial without a determination of competency and no determination without a hearing held, and completed in accordance with the statutory provisions.