The CITY OF RICHMOND, Indiana
d/b/a Richmond Power & Light,
Appellant (Respondent below),

v.

PUBLIC SERVICE COMMISSION of
Indiana, Appellee.

No. 2-179A18.

Court of Appeals of Indiana,
Fourth District.

July 21, 1980.

Rehearing Denied Aug. 18, 1980.

 

 
 
 
 
 
 

 

 
 
 

 

 
 
 
 

 

 
 
 
 
 

 

Paul Hirsch, Haymaker, Hirsch & Fink, Indianapolis, for appellant.

Theodore L. Sendak, Atty. Gen., Jeff G. Fihn, Deputy Atty. Gen., Indianapolis, for appellee.

CHIPMAN, Judge.

The appellant City of Richmond, doing business as Richmond Power & Light (RP&L) was ordered by the Public Service Commission (the Commission) to refund approximately 2.3 million dollars to its customers. On appeal RP&L challenges the order of the Commission. We reverse.

The following issues have been raised by RP&L:

I. Whether the Commission had jurisdiction and the authority to order RP&L to refund monies to its customers.

II. Whether the order was contrary to or not supported by the evidence.

III. Whether the order contained specific findings on all the factual determinations material to its ultimate conclusions.

## FACTS

On July 16, 1974, RP&L filed an emergency petition (pursuant to IC 8–1–2–113) with the Commission requesting approval of a revised schedule of rates.[1] The petition cited the tremendous increase in the cost of power purchased by RP&L from Indiana and Michigan Electric Company (I&M) as justification for the emergency rate increase. The petition further alleged the utility, at that time, was being operated at a deficit in violation of IC 8–1–2–96 which requires a municipal utility to charge a rate sufficient to generate enough revenue to allow the utility to meet its obligations. An accompanying petition filed by RP&L noted the increased rate charged by I&M was conditionally approved by the Federal Power Commission (FPC) and therefore potentially subject to refund. RP&L proposed the Commission retain continuing jurisdiction over the subject matter for the possibility of overseeing RP&L's refund procedure in the event it received a refund from I&M.

A hearing was held on RP&L's petition by the Commission and the latter issued its temporary rate increase order on October 10, 1974. The order noted the confusing and unclear status of the "emergency statute" (IC 8–1–2–113) but nevertheless concluded the Commission did have jurisdiction over the subject matter.

In addition the order found:

1. Pursuant to an FPC order dated October 1, 1973, RP&L was being required to pay an additional $911,000 per year to purchase wholesale electric power from I&M.

2. RP&L proposed to increase its rates 10% across the board, on an emergency basis and subject to a possible refund, to cover these increased costs.

3. Neither the Commission nor RP&L could accurately predict whether the FPC would order I&M to refund any money to RP&L. In light of this fact it was impossible for RP&L to sensibly manage its operations and an emergency existed, within the meaning of the statute.

4. If the increase requested by RP&L was not granted the utility would not have sufficient income to maintain its property.

5. The "[C]ommission should not ignore the obligation imposed upon it by the Emergency Statute in the case of an emergency, such as we have found here to exist *per se* by reason of the FPC interim order, to

---

1. IC 8–1–2–113 reads in part:

 "Suspension of rates in emergency.—The Commission shall have power, . . ., to prevent injury to the business or interests of the people, or any public utility of this state, in case of any emergency, to be judged of by the commission, to temporarily alter, amend, or . . . suspend any existing rates, . . . relating to or affecting any public utility . . . in this state. Such alterations, amendments,

 or suspensions of such rates, service, schedules or practices so made by the commission, shall apply to one or more of the public utilities in this state or to any portion thereof, as may be directed by the commission, and shall take effect at such time and remain in force for such length of time as may be prescribed by the commission. [Acts 1913, ch. 76, § 122, p. 167; 1947, ch. 315, § 1, p. 1264.]"

'. . . prevent injury to the business or interests of the people.'"

6. RP&L shall refund or credit to its customers any amount of excess revenues received by RP&L.

No appeal was taken from the order entered by the Commission.

On December 3, 1974, RP&L petitioned the Commission for a permanent rate increase necessitated by the impact of inflation on its operating costs. In the petition RP&L stated it had:

"no objection to any provision that the Commission may desire with respect to [RP&L] being required to refund any excess rates and charges collected from [RP&L's] customers as a result of a PSCI rate order in the event a subsequent FPC order . . . may prove that said rates and charges may have been excessive."

A hearing was held on RP&L's petition and on August 8, 1975, the Commission issued its order granting RP&L a permanent rate increase, which included the $911,000 temporary rate increase.

The order stated:

"that the rates approved herein shall be subject to refund or credit in the event of a final Federal Power Commission order reducing the cost of electric power to Petitioner from that awarded on an interim basis, and that Petitioner shall be obligated to refund or credit to its customers any amount of excess revenues received by Petitioner as may be determined by the Commission, and under such conditions as this Commission, within its power and continuing jurisdiction over this cause and the parties hereto, deems just and proper."

No appeal was taken from this Commission order.

In 1978 RP&L received a $3,125,802 refund from I&M and on October 31, 1978, RP&L filed a Supplemental Petition for Approval of Refund and Refund Procedure. The following facts were undisputed at the hearing on the petition. RP&L received a total refund from I&M of $3,125,802. One

million dollars of this refund was attributable to the period from October 1973 to December 1976 and the remaining $2,125,-802 was attributable to the period from January 1977 to July 1978. From October 1973 to July 1978, RP&L incurred four rate increases from I&M but only part of one of the rate increases was passed on to RP&L's customers. The remaining increases were absorbed by RP&L. The total expenses incurred by RP&L in securing the refund amounted to $545,819.66 for attorney's, economist's and engineer's fees.

RP&L and the Public Counselor disagreed on how the refund should be calculated, causing their final amounts to differ. Their disagreement centered around whether or not RP&L should be allowed to retain that portion of the refund attributable to the portions of the rate increases that were absorbed by it and not passed on to its customers. The Public Counselor argued RP&L chose not to petition the Commission for further rate increases based on its increased cost of purchased power and therefore it should not be allowed to retain the portion of the refund attributable to the absorbed increases.

RP&L figured its customer's refund by dealing with the two refund periods separately. As to the $1,000,000 1973–1976 refund, it first subtracted $367,016.67, which represented a pro rata portion of the allowable expenses. From the remaining $632,-983.33, RP&L argued it should be allowed to retain $210,994.44 for the increased costs absorbed during the thirteen months prior to the granting of its emergency increase, and $130,574.04 for the portion of the cost increase not passed on to its customers subsequent to the emergency increase. The remaining $291,414.85, representing the increase RP&L passed on to its customers, was to be refunded to them.

From the $2,125,802 refund for the second period (1977–1978), RP&L deducted the remaining expenses $178,802.99, and argued it should be allowed to retain $1,650,-665.76 for cost increases absorbed by it and refund the difference, $296,333.25, to its customers.

In summary, out of the $3,125,802, RP&L contended that its customers were entitled to a refund of $587,748.10. Rather than refund this amount RP&L proposed to credit its customers for one month's billing which would amount to approximately $1,500,000.

The Public Counselor figured the refund by multiplying the amount granted in the emergency order subject to refund, $911,000 per year, times the period covered by the refund, 3.75 years, in arriving at his figure of $3,416,250. Since this amount was greater than the I&M refund, he used the $3,125,802 figure. From this he subtracted the $545,819.66 in allowable expenses and $282,051.28 for cost increases absorbed by RP&L over an eleven month period, leaving a refund due RP&L's customers in the amount of $2,297,931.06.

The Public Counselor also disagreed with the refund procedure suggested by RP&L. His position was the refunds should be given to those who were customers during the period subject to the refund.

In its Order Authorizing Refund, the Commission made these findings of fact:

"1. That the Public Service Commission of Indiana has jurisdiction of the subject matter of this proceeding and of all parties thereto; further, that requisite and proper legal notice was duly given as provided by law.

2. That this Commission, on August 14, 1975, issued its order approving permanent rates for Petitioner herein and further providing for a refund or credit to Petitioner's customers in the event a refund or credit was received by Petitioner reducing the cost of the electric power to Petitioner as a result of a final order of the Federal Power Commission, now Federal Energy Regulatory Commission, all as more fully set out on page 6 of said order.

3. That on September 6, 1978, Petitioner received a refund and credit from the Indiana & Michigan Electric Company in the amount of $3,125,802. The refund covered the cost of electric power to Petitioner from I & M E for the period of October 1973 to July 1978. There were two time frames involved in the refund reflecting the various tariffs of I & M E to Petitioner that were effective for the refund period. From October 1973 through December 1976, during the period when the IP Tariff, at various rate levels, was in effect, Petitioner received the sum of $1,000,000. For the period January 1977 to July 1978, during the period of time when the WS Tariff was in effect for Petitioner's purchases of power from I & M E, the refund amounted to $2,125,802.

4. That in the temporary rate increase allowed by this Commission on October 10, 1974, total annual revenues of $911,000 were allowed for the increase of purchased power purchased by Petitioner from I & M under rates set by the Federal Power Commission; that such order was issued subject to refund in the event any portion of the increase allowed for purchased power costs were ultimately refunded to Petitioner because of a reduction in the rates charged by I & M ordered by the FPC.

5. That the permanent rate increase order issued August 14, 1975, also included in the revenues allowed the Petitioner the $911,000 granted in the temporary rate increase; that said order also made said rates subject to refund in the event any portion of the increase allowed for purchased power costs were ultimately refunded to Petitioner because of a reduction in the rates charged by I & M ordered by the FPC.

6. That the amount of refund due to Petitioner's ratepayers is $911,000 per year times the period of the refund or $3,416,250. Since this amount exceeds the total of the negotiated refund amount of $3,125,802 received from Indiana & Michigan Electric, we are therefore confined to the actual refund figure. By subtracting the allowable expenses, that were used by both Petitioner and Public, a net refund figure of $2,297,931 is due the Richmond Power & Light ratepayers, less any expenses chargeable to the refunding operation.

7. That the Petitioner maintains that the refund is due is $587,748, but that Petitioner is willing to refund $1,500,000.

8. That the total amount to be refunded should be $2,297,931 as set out in Finding No. 6 above less the expenses incurred by Petitioner in making the refund."

The Commission also made findings as to the manner in which the refund was to be made and then entered orders consistent with all of its findings.

## I. THE COMMISSION'S JURISDICTION

On appeal RP&L has challenged the Commission's jurisdiction and authority to order it to make a refund. Citing *Town of Merrillville v. Lincoln Gardens Utilities Company, Inc.*, (1976) Ind.App., 351 N.E.2d 914, RP&L argues:

"[T]he Public Service Commission possesses only that power and authority granted to it by statute. Unlike a Court, it cannot resort to the common law for authority to act:

'When the power of the Public Service Commission comes in question it must be recognized it is a statutory board which derives its power and authority solely from the statute, and unless a grant of power and authority can be found in the statute it must be concluded that there is none.' " (citations omitted)

*Id.* at 919. Continuing its argument, RP&L contends the Commission's enabling statutes do not empower it to order a refund under these circumstances, and therefore the Commission's order should be vacated by this Court.

RP&L raises this argument now despite having stated in its 1974 and 1975 petitions that it had "no objection to any provision that the Commission may desire with respect to [RP&L] being required to refund any excess rates . . ." RP&L also challenges the Commission's jurisdiction over it as a municipal utility under the emergency statute despite having specifically requested relief under the emergency statute in its 1974 petition.

In its brief, the Commission asserts RP&L should be estopped from challenging its jurisdiction to order a refund under the emergency statute since RP&L expressly sought relief under that statute, but no argument is made in support of this assertion.

■ While we may question the ethics of dealing with the Commission in such a manner, we can not hold RP&L is estopped from raising its challenges. The challenges are jurisdictional, can be raised at any time, and the failure to raise the challenges until appeal does not constitute a waiver or an estoppel. *Morrison v. Morrison,* (1960) 130 Ind.App. 270, 164 N.E.2d 113.

RP&L relies on *Indiana Telephone Corp. v. Public Service Commission of Indiana,* (1960) 131 Ind.App. 314, 171 N.E.2d 111, for support of its assertion refunds may only be ordered by the Commission pursuant to IC 8-1-3-6, which is inapplicable in this case. Appellant has interpreted *Indiana Telephone* too broadly.

In that case the petitioner went before the Commission and requested a *permanent* rate increase. After holding a hearing on the petition, the Commission found the increase to be justified based on the petitioner's income and expenses and issued its order granting the rate increase and instructing the utility to upgrade the quality of some of its equipment. The petitioner's schedule of rates was filed and went into effect. Subsequently, the Commission granted a petition for rehearing filed by intervenors. At the rehearing approximately one year later, the Commission found the evidence was insufficient to substantiate the rate increase. The Commission reached this conclusion after adopting the intervenor's argument that the petitioner's accounting methods inadequately appraised the Commission as to the petitioner's financial status. At the original hearing on the rate increase, the accounting methods were not in issue. Based on its new findings the Commission ordered the previous rates reestablished and required the utility to refund to its customers the amount of the rate increase for the period of time it was collected.

On appeal, the Court framed the refund as a retroactive order. In determining the Commission acted without authority in making the retroactive order, the Court pointed out the decision by the Commission after the rehearing was based entirely on the accounting method issue which was not raised at the original hearing, and the petitioners had spent over one million dollars on capital improvements as directed in the original order.

RP&L cites the following language from *Indiana Telephone* to support its argument that the PSC can not order a refund and therefore the refund ordered in this case was done so without authority.

"We find nothing in the statute (IC 8–1–2–68) giving the Commission the power to cancel, or to fix, rates retroactively. The statute provides the Commission with the power to fix rates *for the future* if it finds the rates in effect to be unreasonable or unjust; but we look in vain to find statutory authority for the Commission to fix rates *for the past.* The Commission has no powers except those conferred by statute." (citations omitted)

171 N.E.2d at 124.

RP&L's argument based on *Indiana Telephone* is distinguishable from this case in two ways. First, *Indiana Telephone* involved a petition for a permanent rate increase as opposed to the emergency request filed by RP&L in accordance with IC 8–1–2–113. The *Indiana Telephone* Court found no statutory authority to fix rates retroactively under Burns' 54–423, now IC 8–1–2–68. The Court did not say the authority could not be found under another statute such as the emergency statute, IC 8–1–2–113.

Secondly, the Commission's actions in dealing with Indiana Telephone Corporation were clearly retroactive. Its original order

granted a permanent rate increase and directed the utility to upgrade some of its equipment. The utility acted accordingly and relied on the finality of the Commission's order.[2] Subsequently, the Commission reversed its decision and made it retroactive. In *Indiana Telephone,* Judge Bierly expressed a concern for the ability of utilities to attract capital from investors if the Commission was allowed to fix rates retroactively and order refunds.

None of these retroactive considerations are involved in this case. Throughout the time period in question, RP&L knew it would have to pay a refund to its customers if it received one from I&M. RP&L even suggested a refund would be appropriate when it went before the Commission in 1974 and a refund provision was clearly included in both the Commission's 1974 and 1975 orders. Additionally, in contrast to Indiana Telephone Corporation, RP&L received over three million dollars from I&M in 1978 and thus has the funds to pay the refund to its customers. Further, based on the Commission's order, RP&L will be $827,871.00 richer after the I&M refund has been distributed, than it would have been if there had been no I&M refund. Accordingly, RP&L cannot claim it relied on the finality of the Commission's orders, nor can it claim the Commission's order has impaired its ability to attract capital investment in the future.

The refund ordered by the Commission was not retroactive, it was prospective. The original refund provision in the 1974 order did not revert back. Instead it was prospective and said if in the *future* RP&L received a refund from I&M, it would be liable for a refund to the extent of the excess revenues received. Having found the Commission's order not to be a retroactive refund forbidden by *Indiana Telephone*

---

2. The order of the Commission could have been appealed to this Court under IC 8–1–3–1 and the utility could have been required to make a refund to its customers under IC 8–1–3–6 if it lost on appeal. But if an appeal had been taken, the utility would have been on notice as to the unsettled status of the Commission's order. On the contrary, when the intervenor's petition for rehearing was granted by the Commission, the utility was on notice that its rate increase might be withdrawn, but it was not on notice that it might be liable for a refund since there was no provision similar to IC 8–1–3–6 concerning the outcome of rehearings.

it becomes necessary for this Court to decide whether or not the emergency statute applies to municipally owned utilities, and if it does, whether or not the Commission may properly order a prospective refund pursuant to it.

The emergency statute IC 8–1–2–113 (see footnote 1) grants the Commission authorization to alter and amend existing rates of public utilities. The question in this case is whether RP&L, a municipally owned utility, is to be treated like a public utility subject to the provisions of IC 8–1–2–113.

Under IC 8–1–2–1 municipally-owned utility "shall include every utility owned or operated by a municipality." The same section specifically excludes a utility owned by a municipality from the definition of a public utility. There is no disagreement in this case that RP&L is a municipally-owned utility.

Citing *Citizens Gas & Coke Utility v. Sloan*, (1964) 136 Ind.App. 297, 196 N.E.2d 290, as its authority, RP&L argues the emergency statute applies only to public utilities, and therefore the Commission could not resort to it find authority to make this prospective refund order. The *Sloan* case is also distinguishable from this case. In that case, appellee Sloan and others petitioned the Commission to order the municipal utility to cease and desist its exercise of its power of eminent domain. The utility filed a motion to dismiss contending the Commission did not have jurisdiction over it since it was a municipal utility.

In analyzing the Commission's jurisdiction over municipal utilities, the Court noted municipal utilities

"are not subject to the general grant of authority to the Public Service Commission. . . . [H]owever, that in some instances the Public Service Commission does have jurisdiction over municipal utilities. Certain statutes do require the Commission's formal approval, at least, of municipal utilities' acts. An example of this is rate making. . . . It would seem, therefore, that in those areas specifically set forth by statue the Commission may have jurisdiction; but in areas

not specifically set forth, the general statute exempting municipal utilities from Public Service Commission jurisdiction controls."

196 N.E.2d at 295.

In *Sloan* the Court held the Commission did not have jurisdiction over a municipal utility as to its exercise of its power of eminent domain. The issue of the Commission's jurisdiction as to rate making was not at issue in that case although it was addressed by the Court as an example of where the Commission does have jurisdiction over a municipal utility.

Under IC 8–1–2–100:

"[A]ny municipality now owning or operating a utility shall be subject to the jurisdiction of the commission for the purpose of fixing rates to be charged the patrons of the utility for service, and for that purpose the commission is given jurisdiction to proceed in the same manner and with like power as is provided by this chapter in the case of public utilities: . . . ."

■ The refund at issue is this case arose out of a rate making procedure. The emergency statute was invoked to grant RP&L a rate increase. Since the Commission could have invoked the emergency statute to come to the aid of a public utility in a crisis situation similar to RP&L's, we hold the Commission had "*jurisdiction* to proceed in the same manner and with like *power*" to aid RP&L. IC 8–1–2–100.

The question still remains whether or not the Commission has the authority to make *this type* of order under the emergency statute. In dealing with RP&L's 1974 petition, the Commission found itself in a very difficult position. Under IC 8–1–2–96 the Commission may not allow a municipal utility to charge an illegal, unjust or unreasonable charge. The Commission's dilemma in determining what is just and reasonable was addressed in *Indiana General Service Co. v. McCardle*, (1932 S.D.Ind.) 1 F.Supp. 113, 115:

"[T]he commission has authority to find, upon proper hearing, that an emergency

exists, and either increase or reduce the rate in accordance with such emergency, as shown by the evidence in such case. Such rate cannot be reduced, however, to such an extent as to deprive the utility of a fair and reasonable return upon the value of its property, used and useful in supplying the utility to the city or town under consideration. Neither can it increase the rate so as to permit the utility to receive more than a reasonable return upon the value of its property." (applying section 122 of the Shively-Spencer Utility Act of Indiana, now IC 8–1–2–113).

■ In the case before us the Commission had three choices it could have made. First, it could have denied the emergency rate increase request. This would have resulted in RP&L being unable to meet its financial requirements and therefore unlawful since it would not be in compliance with IC 8–1–2–96. Second, it could have granted the request which would have resulted in just and reasonable rates being charged until RP&L received I&M's refund, then the combination of the rate increase and the refund would have resulted in making the rate increase unjust and unreasonable, overcharging RP&L's customers, and providing RP&L with a windfall. Third, the Commission could have done what it did, grant the rate increase subject to a refund to account for the problems involved in the other two choices.

A similar procedure was approved by the Court in *Twin City Realty Corp. v. Clay Utilities, Inc.,* (1970) 146 Ind.App. 629, 257 N.E.2d 686. In that case several developers sought relief from the Commission under the emergency statute from a $300 hook-on fee being charged by the utility. They requested the Commission either reduce the hook-on charge or, in the alternative, require the utility to post a bond to assure a refund to the developers if the hook-on charge was found unreasonable. The developers argued the bond was needed to insure them a remedy since the Commission could not make a retroactive order. Although at one point in its opinion the Court states the

issue was not whether the relief could be granted, it later says "the Commission had authority to grant the emergency relief requested." 257 N.E.2d at 694. To hold otherwise would leave the Commission so constrained as to preclude it from preventing injury to the business or interests of the people or the utility in an emergency situation such as the one involved in this case.

## II. SUFFICIENCY OF EVIDENCE
### AND OF
## III. FINDINGS TO SUPPORT CONCLUSIONS

RP&L next challenges the sufficiency of the evidence to support the Commission's 1978 order and argues the order did not contain specific findings of fact on all the factual determinations material to its ultimate conclusions. We agree with the former contention and therefore reverse, but we will address the other issue raised by RP&L to provide the Commission with some guidance when dealing with this case on remand.

The two issues are argued interchangeably in both parties' briefs and we shall address them together rather than separately.

In both its 1974 and 1975 orders, the Commission ordered RP&L to refund "any amount of excess revenues received by" RP&L resulting from an I&M refund. Its 1978 order determined the amount of the excess revenues received. RP&L now complains the Commission did not define "excess revenues" and did not provide it with any clear guidelines as to its meaning.

■ We find no evidence in the record of RP&L having ever requested a clarification of the phrase from the Commission and it objects only now after the Commission has defined it in a manner not to its liking. RP&L could have requested a clarification from the Commission after it had entered its 1974 order and it could have appealed that order or interpretation to this Court if it felt it was not being treated justly by the Commission. RP&L cannot sit back, how-

ever, and wait four years to see if the Commission interprets the phrase to its liking and then appeal if it does not agree.

■ The 1974 order stated RP&L would not have sufficient funds to properly maintain its property and service without an emergency rate increase. To alleviate this problem, the Commission granted the $911,000 per year increase subject to a refund. This amount provided RP&L with sufficient revenues to properly meet its expenses and any money received over that amount, I&M's refund for example, would constitute excess revenues. As evidenced by its findings in the 1978 order, the Commission was not using the phrase "excess revenues" in any technical manner but rather in its normal everyday usage. Excess revenues were those revenues in excess of the amount RP&L was legally entitled to receive.

RP&L also disagrees with the Commission's determination of the amount of revenues it was legally entitled to receive. The disagreement revolves around whether or not RP&L may subtract from the refund due its customers, the amount of the rate increases it received from I&M subsequent to the 1974 order which it did not pass on to its customers. At the Commission's hearing on the refund, there was no disagreement as to the general principle when a utility absorbs a purchased power cost and does not pass it on to its customers, the utility does not need to refund the money to its customers. The undisputed evidence shows RP&L did absorb some purchase power costs, rate increases from I&M, and did not pass them on to its customers.

The Commission chose not to allow RP&L to deduct these absorbed increases from the refund due its customers. RP&L argues this decision is contrary to the evidence. We disagree. Although there was no disagreement as to the *principle* stated above, there was conflicting testimony as to whether or not the Commission should apply that principle in this case. Glen Courtney, staff accountant with the Commission, testified there were approved means of passing these increases on to customers and RP&L chose not to employ them. This

failure to "come to the Commission for permission to pass on any of these additional increases it received in its purchase power costs" was noted in the Commission's refund order.

■ The Commission apparently allowed RP&L a credit on the amount of refund due its customers equal to the amount of the purchased power increases it absorbed prior to the emergency rate request. Thus the Commission chose to abide by the principle when RP&L came before it, but declined to apply said principle in this instance where RP&L is attempting to pass on the purchased power increases unilaterally. So long as there is substantial evidence in the record to support the Commission's decision, it must be upheld. *United Telephone Company of Indiana, Inc. v. Public Service Commission*, (1980) Ind.App., 402 N.E.2d 1013.

■ In its reply brief, RP&L raises for the first time its contention the Commission failed to make all of the necessary determinations relative to IC 8–1–2–96. Basic principles of fairness require us to ignore contentions raised for the first time in an appellant's reply brief. To do otherwise would be unfair to the appellee who would be unable to respond to the untimely raised contention, and would defeat the purpose of having appellate briefs filed in their presently required order. See *State v. Marion Circuit Court*, (1958) 238 Ind. 637, 153 N.E.2d 327.

■ Lastly, RP&L challenges the Commission's refund order on the grounds that the order does not contain specific findings of fact in reaching the determination it does in paragraph 6.

"6. That the amount of refund due to Petitioner's ratepayers is $911,000 per year times the period of the refund or $3,416,250. Since this amount exceeds the total of the negotiated refund amount of $3,125,802 received from Indiana & Michigan Electric, we are therefore confined to the actual refund figure. By subtracting the allowable expenses, that were used by both Petitioner and

Public, a net refund figure of $2,297,931 is due the Richmond Power & Light ratepayers, less any expense chargeable to the refunding operation."

RP&L argues paragraph 6 does not contain sufficient specific findings on all material factual determinations to allow this Court a rational and informed basis for review.

"[T]he PSC's orders must be based upon substantial evidence in the record and be specific enough to enable this court to intelligently review the PSC's decision."

*United Telephone Company of Indiana, Inc. v. Public Service Commission, supra,* at 1016. We disagree with this argument. The order specifically found the amount of the refund due the customers, $3,416,250, how it was determined, $911,000 times the period of the refund which is specifically found in paragraph 3, how it was reduced to the amount of the actual refund, and how it was further reduced by $827,870 ($3,125,802 minus $2,297,931) for allowable expenses. But, we do find the figure used by the Commission for allowable expenses to be unsupported by substantial evidence in the record.

The Commission's $827,870 figure came from Public's Exhibit number 1, a memo from Glen Courtney and Gene Ruesch, staff accountants, to Larry Wallace, Chairman of the Commission. The memo separately lists expenses for attorneys, economists, and engineers and miscellaneous expenses, totalling $545,819.66. The additional $282,051.28 is listed as "Cost Increase Absorbed by Richmond Power & Light (11 months)." There is no explanation whatsoever in the record, either from the memo itself or from Mr. Courtney's testimony, as to how this figure was determined nor what eleven months it covered.

The order speaks of the "allowable expenses, that were used by both Petitioner and Public." It is clear from the record RP&L and the Commission's accountants agreed on the $545,819.66 figure. It is equally clear there was no agreement on the credit RP&L was to receive for cost increases absorbed.

"When reviewing an administrative decision for sufficiency of the evidence, we reverse only when the findings of fact are unsupported by substantial evidence; the findings must have a 'reasonably sound basis of evidentiary support.' *City of Evansville v. Southern Indiana Gas and Electric Company,* (1975) Ind.App., 339 N.E.2d 562, 571–72."

*Old State University Corporation v. Greenbriar Development Corporation,* (1979) Ind.App., 393 N.E.2d 785.

"Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Consolidated Edison Co. v. NLRB,* (1938) 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126.

The Commission's finding regarding allowable expenses, is unsupported by *substantial* evidence as to the amount of a credit RP&L is entitled to for increased costs it absorbed.

This case is remanded to the Public Service Commission for further action consistent with this opinion.

MILLER, P. J. and YOUNG, J., concur.