548 N.E.2d 153 (1989)
NORTHERN INDIANA PUBLIC SERVICE COMPANY, Appellant,
v.
CITIZENS ACTION COALITION OF INDIANA, Inc., et al., Appellees. Citizens Action Coalition of Indiana, Inc., et al., Cross-Appellants,
v.
Northern Indiana Public Service Company, Cross-Appellee.
No. 93S02-8810-EX-902.
Supreme Court of Indiana.
December 13, 1989.
*154 Robert C. Hagemier, David J. Allen, Christopher A. Smith, Hagemier, Allen & Smith, Indianapolis, Frederick F. Eichhorn, Jr., Peter L. Hatton, Charles W. Webster, Eichhorn, Eichhorn & Link, Hammond, for appellant.
Michael A. Mullett, Columbus, James W. Burk, Office of the Utility Consumer Counselor, Indianapolis, for appellees.
DeBRULER, Justice.
This appeal is the third in a trilogy of cases that arose out of disputes concerning the legality of a utility charging its ratepayers for its sunk costs in a power plant which was abandoned before construction was completed. The first case arose when Northern Indiana Public Service Company (NIPSCO) petitioned the Public Service Commission of Indiana (now the Indiana *155 Utility Regulatory Commission but referred to hereinafter as the commission) for a rate increase to recover the money it had invested in Bailly N-1, a nuclear power plant. NIPSCO had cancelled the project during construction. The commission granted the petition, and NIPSCO began collecting the amortized costs from its ratepayers. Citizens Action Coalition (CAC) and others who had intervened in the proceedings appealed the commission's ruling. The appeal culminated in our decision in Citizens Action Coalition of Indiana, Inc. v. Northern Indiana Public Service Co. (1985), Ind., 485 N.E.2d 610, cert. denied, 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687 (1986) (NIPSCO I), in which it was held that charging these sunk costs to ratepayers was unlawful because Bailly N-1 had never become used and useful property, and therefore the increased rates were not based on service as required and defined by statute. The commission was ordered to vacate its order granting the rate increase. Id. at 617. While this first appeal was pending, two subsequent orders were issued by the commission adjusting NIPSCO's rates. Because the appeal had not yet been decided, these rate orders contained within them as a matter of course the rate hike attributable to the sunk costs of Bailly N-1. However, the Bailly costs were not an issue in those proceedings and no appeal was taken from those rate orders.
On remand, the commission issued an order directing NIPSCO to immediately excise from its rates that portion which reflected the illegal charges for the Bailly costs and set a hearing to determine the amount and manner of the refund due the ratepayers. NIPSCO refused to lower its rates and appealed the commission's order on the grounds that it was entitled to a hearing before any rate reduction took place. That appeal resulted in our decision in Northern Indiana Public Service Co. v. Citizens Action Coalition of Indiana, Inc. (1986), Ind., 493 N.E.2d 762 (NIPSCO II), in which it was held that the initial hearing conducted when NIPSCO petitioned for a rate increase to cover its sunk costs in Bailly was all that was required by statute, and therefore NIPSCO was not entitled to an additional hearing on remand before the commission ordered a rate reduction pursuant to the mandate of this Court in NIPSCO I. NIPSCO then reduced its rates to remove the amortized Bailly costs from its rate base, and the commission heard evidence and testimony to determine the amount and manner of refund and whether interest and attorneys' fees could be recovered. That proceeding resulted in the commission order from which NIPSCO brings the present appeal and CAC cross-appeals.
The commission determined that NIPSCO owed its ratepayers $56,856,072, but it stayed repayment pending this appeal. It also ordered interest on the refund to accrue at a rate of six percent from the date of its final amended order, and it denied CAC's request to receive attorneys' fees out of the total refund.
NIPSCO raises two issues on appeal. First, it maintains that it owes a refund only for the amortized Bailly costs it collected from the time of the commission's initial order which authorized those costs to the date of the first interim order which adjusted rates while the Bailly cost authorization was being appealed. It argues that because those two interim orders, which contained a rate base that included the amortized Bailly costs, were not appealed, CAC and the other intervenors have waived challenging the costs that were collected under those orders and that therefore NIPSCO should be permitted to keep the funds it collected during that time. In so arguing, NIPSCO invites this Court to authorize the utility's retention of money it obtained through an administrative order that was declared unlawful. We decline the invitation. The recovery of Bailly sunk costs was not an issue in either of the two interim rate orders that were approved while NIPSCO I was pending. It is therefore difficult to surmise how CAC or any of the intervenors were to frame an appeal from such orders. Had they attempted to do so, they would have been appealing an issue not raised in the order appealed from and one that they already had pending before this Court. We hold *156 that our decision in NIPSCO I pertains to all Bailly costs wrongfully recovered by NIPSCO from its ratepayers.
Second, NIPSCO argues that our decision in NIPSCO I authorizes it to charge its ratepayers for planning, analysis and investigation expenses and that it should therefore be permitted to retain from the refund the portion attributable to this expense. With this possibility in mind, the commission received testimony and evidence on the amount of money that was expended for these purposes. The calculations ranged from $1.5 million to $57 million. However, the commission found that our opinion in NIPSCO I did not "provide sufficient authoritative guidance to allow the recovery of those planning, analysis and investigation expenses" and therefore did not allow NIPSCO to offset such costs from its refund obligation. The commission's reading of NIPSCO I is correct. The majority opinion there does not provide for the retention of planning, analysis and investigation costs by NIPSCO. The issue of such costs was raised only in the concurring opinion of Justice Shepard which, in referring to their recovery, stated:
Unfortunately, this view has not attracted sufficient concurrence to make it an order of the Court, and I have joined the majority in its conclusions on the construction of the Public Service Commission Act.
NIPSCO I, 485 N.E.2d at 619. The conclusions reached by the majority as to the construction of the Public Service Commission Act are clear: none of the costs expended by a utility for a power plant that never became used and useful property because its construction was abandoned are chargeable to the utility's ratepayers. Neither the statute nor the opinion makes an exception for planning, analysis or investigation expenses.
Nevertheless, NIPSCO argues that because then-Chief Justice Givan and Justice Prentice would have allowed all costs to be recovered from the ratepayers, see NIPSCO I, 485 N.E.2d at 619-625 (Givan, C.J., and Prentice, J., dissenting), and because Justice Shepard's opinion, as NIPSCO reads it, would have allowed planning, analysis and investigation costs recovered, id. at 617, a majority of the Court favored allowing NIPSCO to set off such costs from the refund it owed its ratepayers. This is a seductive, but unpersuasive argument. Justice Shepard expressly joined the majority opinion in his concurring opinion, as indicated in the above quote. That majority opinion found that no costs associated with Bailly were recoverable from ratepayers. Neither the majority opinion nor either of the dissenting opinions excise for separate consideration the issue of planning, analysis and investigation expenses as recoverable sunk costs. Neither of the dissenters joined in Justice Shepard's concurring opinion in whole or in part, and both dissents refer to the lead opinion as the "majority opinion." The mere ability to construct, from various concurring and dissenting opinions, a common denominator of probable outcome on an issue addressed in only one of those opinions does not make for a majority holding of this Court. Where a specific issue or view fails to attract a majority of specific concurring votes, the threshold between dictum and rule of law is not crossed and no mandate is generated nor legal authority granted as to that issue or view. For example, in Bryan v. State (1982), Ind., 438 N.E.2d 709, a majority of this Court favored reversal of the appellant's conviction, but because there was not a majority favoring reversal on any specific issue, the conviction was affirmed.
The situation here is analogous to the denial of transfer in Peoples Bank and Trust Co. v. Stock (1980), 273 Ind. 342, 403 N.E.2d 1077. In that case, Justices Pivarnik and Givan voted to grant transfer. Justice Prentice expressed an intent to grant transfer on a separate issue, but, failing to muster a majority on that issue, reluctantly joined the majority in voting to deny transfer. Transfer was denied despite the fact that three of five justices favored granting it. This outcome was not altered by the fact that one of the votes denying transfer was made reluctantly. The outcome here should, likewise, not be altered by that fact. The system of appellate *157 justice can work no other way. If the mandates of this Court are to have any meaning at all, they must be interpreted in a manner consistent with the traditional and long-adhered-to voting language of the Court. The majority opinion in NIPSCO I and the order incorporated therein represents the majority view and mandate of this Court. We reaffirm that holding here. The original order of the commission granting NIPSCO the authority to recover its sunk costs in its abandoned nuclear power plant, Bailly N-1, was contrary to law and remains vacated, and NIPSCO's ratepayers are entitled to a refund of all such amortized costs collected by NIPSCO. The commission's order denying NIPSCO a setoff from the refund for planning, analysis and investigation costs is affirmed.
CAC has raised three issues in its appeal. It first maintains that the commission's determination of the amount of interest on the refund due the ratepayers was erroneous. CAC compared the commission's order to a judgment and argued that it was entitled to pre-judgment interest at the market rate and post-judgment interest at the statutory rate. See I.C. 24-4.6-1-101. The commission accepted the argument of NIPSCO and determined that it lacked the statutory authority to award interest on the refund. However, it found sufficient authority in its rules and regulations, which require electric utilities to pay interest on customer security deposits, 170 I.A.C. 4-1-15(D), to award six percent interest on the refund from the date of its amended final order.
As CAC points out in its brief, the commission's position is questionable inasmuch as it has, in previous cases, awarded interest on refunds ordered to be paid by utilities to ratepayers. On those occasions, the commission has stated:
Interest should be granted on the refund and this Commission takes administrative notice that the Federal Energy Regulatory Commission, Washington, D.C., utilizes 9% on refunds for interest and the only testimony herein is that a nominal rate would be 9%. We find that the authority of the Public Service Commission is not limited by statute so far as the legislature has constitutional power to grant such authority... .
In ordering interest to be paid on the refund herein we are simply stating that if I & M is not entitled to the $8,100,000 to be refunded, it is equally not entitled to the reasonable interest occurring thereon. In ordering interest to be paid on the refund we are not establishing new policy outside the statute.
In re Indiana & Michigan Elec. Co., Ind. Pub.Serv. Comm'n No. 34588 (January 21, 1981) (citation omitted); and:
If the Petitioner was not entitled to the amounts to be refunded it is equally not entitled to the use of said funds interest free.
... .
The Commission, in ordering interest to be paid on the refunds ordered herein, is not establishing a new practice.
In re Muncie Waterworks Co., Ind.Pub. Serv. Comm'n No. 34571 (September 16, 1981).
It is not clear from the final order here the reason for the commission's departure from its prior stance regarding its authority to require that interest be paid on refunds made to ratepayers. In support of the restraint it exercised in this case, the commission quoted from our opinion in NIPSCO I that the commission derives its power and authority from its enabling statute and that "unless a grant of power and authority can be found in the statute it must be concluded that there is none." NIPSCO I, 485 N.E.2d at 612. However, this rule of law was well settled long before any of the commission's orders regarding the payment of interest on refund obligations were issued. See Chicago & E.I.R. Co. v. Public Service Comm'n (1943), 221 Ind. 592, 594, 49 N.E.2d 341, 341. The facts of the present case are not sufficiently distinguishable from those in the cases where interest was awarded to explain why this rule would be applied now to prevent interest and not then to the same effect. To the extent that the commission relied on the quoted language in determining that it lacked the statutory authority to order that *158 interest be paid on the refund money kept by NIPSCO, such reliance was misplaced. Not all power and authority granted to the commission by the legislature is explicitly delineated in the statute. In addition to the well settled principle above, it is equally well settled that an administrative agency has such implicit power and authority as is inherent in its broad grant of power from the legislature to regulate which is necessary to effectuate the regulatory scheme outlined by the statute. Board of Trustees v. State (1966), 247 Ind. 570, 219 N.E.2d 886, 890. The commission is given just such a broad grant of authority by the legislature to regulate public utilities in the Public Service Commission Act and its companion statutes in title 8 of the Indiana Code. Therefore, if the authority to make an award of interest is implicit in the powers granted to the commission to regulate utilities, that such authority is not expressly spelled out in the enabling legislation is not a bar to ordering that interest on the refund be returned to the ratepayers.
CAC approaches the issue from a different perspective, arguing that the statute governing the commission does not abrogate the rights that the ratepayers would have had at common law to receive interest on money owed to them. Since they are required by statute to proceed through administrative channels in seeking relief and because the statute must provide them with the same or equivalent redress as an action at common law, they maintain that they are entitled to interest on the refund held by NIPSCO.
The question before us is, therefore, two-fold. We must determine whether the ratepayers are entitled to interest on the refund and whether the commission has the authority to grant the refund if the ratepayers are so entitled.
There is little doubt that in the absence of the enabling legislation of the Public Service Commission Act, the ratepayers could have brought an action in a court of law for the money the utility owed them. Once the action had resolved into a judgment, the ratepayers could have received interest on that sum. However, such interest would accrue not as a matter of common law right, but as a result of statutory entitlement. Interest on a money judgment has never been recognized by the common law, but in Indiana under I.C. 24-4.6-1-101, as in most states, interest accrues on a money judgment from the time a verdict is returned. However, we have long held that commission orders are not judgments, State ex rel. Indianapolis Water Co. v. Niblack (1959), 240 Ind. 32, 161 N.E.2d 377; Valparaiso Lighting Co. v. Public Serv. Comm'n (1920), 190 Ind. 253, 129 N.E. 13, so CAC may not rely on the judgment interest portion of the statute to support its argument that NIPSCO's ratepayers are entitled to interest on the money withheld from them. On the other hand, the statute does provide for interest on "money had and received for the use of another and retained without his consent." I.C. 24-4.6-1-103. This provision would allow recovery of interest, from the time a demand for the return of the funds is made, on funds mistakenly paid to another. American Mutual Life Ins. Co. v. Bertram (1904), 163 Ind. 51, 70 N.E. 258.
The right to receive interest on money owed or withheld can also be found in the common law in the rules that allow interest as damages, but the history of this right is somewhat checkered and confusing. The early common law, reflecting religious and societal prohibitions that stretched back to ancient times, frowned on all forms of interest. McCormick on Damages, § 51 at 207 (1935). However, with the growth of the mercantile class in the late middle ages, interest on money loaned became a common commercial practice and was recognized by statute as early as 1545. Id. at 208. This form of interest between private parties should be distinguished from interest as damages, which was recognized in England by 1780, but was allowed only "upon a contract for payment of money on a day certain." Id. at 209. This rule was expanded by statute in 1833 to include actions for trover and trespass. Id. at 209-10.
The attitude in this country toward the recovery of interest as damages has been "less intransigent" than that found in the *159 English common law. Id. at 210. It was recognized early on that interest should be allowed as damages for the withholding of another's funds regardless of whether the obligation arose from a contract or the wrongful acquisition or detention of another's money. Id. This view found expression in the maxim "interest goes with the principal, as the fruit with the tree," Himely v. Rose, 9 U.S. (5 Cranch) 312, 317, 3 L.Ed. 113 (1809), and was grounded in the theory that held money fails to yield a return only in the rarest of circumstances. Therefore, where an ascertainable amount was owed to another, denying interest on the sum amounted to a double wrong by depriving the person owed of the increase to which he was justly entitled and by allowing the one holding the funds to profit from the use of funds that did not rightly belong to him. Nashua & Lowell R. Corp. v. Boston & Lowell R. Corp., 61 F. 237, 251 (1st Cir.1894). This same rationale provides a basis for awarding what has become known as pre-judgment interest in tort cases where the damage suffered is complete and readily ascertainable as of a particular time through recognized standards of value and in accordance with fixed rules of evidence. Dobbs, Handbook on the Law of Remedies, § 3.5 at 165-66 (1973).
Indiana law reflects this view. In New York, Chicago & St. Louis Railway Co. v. Roper (1911), 176 Ind. 497, 96 N.E. 468, a case involving damage to property, this Court adopted the view that a plaintiff, to be fully compensated, must receive interest on damages as a matter of right from the time the cause of action accrues when the above standards are met. The award of interest in these circumstances was therefore held to be not discretionary with the jury as this was the only way to assure the claimant was returned to status quo. The Roper court relied on an earlier case, Pittsburgh, Ft. Wayne & Chicago Railway Co. v. Swinney (1884), 97 Ind. 586, which allowed interest as damages where the action was for trespass to land.
Given this rule that fully compensating a claimant demands that interest be paid where the amount of damage is readily ascertainable as of a particular time, it is apparent that, a fortiori, where the common law action is for an amount of money owed, interest is recoverable as damages since its amount is obviously more "readily ascertainable" than in an action where the damages sought are for injury to property. It is clear then that, under common law, CAC could bring an action for the money NIPSCO owed them and receive, as part of its judgment, interest on the money withheld from the date of its payment and may also have a right to interest under I.C. 24-4.6-1-103. The amount paid here was clearly ascertainable and is not in dispute. Whether CAC retains this right to interest on the funds held by NIPSCO depends on whether the enabling legislation that empowers the commission has abrogated this right.
It is well settled that "the legislature does not intend by a statute to make any change in the common law beyond what it declares either in express terms or by unmistakable implication." Chicago and Erie R.R. Co. v. Luddington (1910), 175 Ind. 35, 42, 93 N.E. 273, 273 (on rehearing). Furthermore, the implied repeal of a statute is recognized only when a later act is so repugnant to an earlier one as to render them irreconcilable, and a construction which will permit both laws to stand will be adopted if at all possible. Freyermuth v. State ex rel. Burns (1936), 210 Ind. 235, 2 N.E.2d 399. Because the right to interest on money withheld is not addressed expressly in the Public Service Commission Act, we must find that such right is abrogated only if done so by "unmistakable implication," and if the interest statute, I.C. 24-4.6-1-103 is irreconcilable with the Public Service Commission Act.
The statutory scheme set up by the Public Service Commission Act operates primarily to protect consumers and assure them of continuing service at a reasonable price. In the ideal free market economy, this assurance is usually provided by competition, which keeps prices from becoming unreasonably high. However, economies of scale often dictate that utilities can be provided to consumers more efficiently by *160 granting a monopoly to one company. The role of the commission in such a case becomes one of compensating for the missing element of competition, assuring a fair price to the consumer and a fair return to the utility, which in turn assures a continuing supply of the commodity or service provided by the utility. See Public Serv. Comm'n v. Indiana Bell Tel. Co. (1955), 235 Ind. 1, 130 N.E.2d 467. In general, what is altered by such a scheme is the way in which the utility operates, not the rights of consumers who are the intended beneficiaries of the protection provided by the statute's grant of oversight authority to the commission. There is nothing in this general regulatory scheme that is irreconcilable with the interest statute or which betrays by unmistakable implication an intent to abrogate a ratepayer's right to receive interest on money owed him, nor do any of the individual portions of the statute betray such an intent.
The section which most nearly addresses this question is I.C. 8-1-3-6, which allows a utility to charge and collect from its customers at a new and higher rate even while that new rate is being challenged on appeal and mandates that if the rate is not sustained on appeal, the utility must "refund the difference" to each consumer. This hardly reveals an intent by unmistakable implication to do away with the common law right to receive interest on money owed, nor can it be termed, in even the most remote sense, as irreconcilable with the interest statute. Indeed, this section can be read in harmony with both the interest statute and the common law rule since it does not limit the amount of the refund to only the difference between the two rates. That difference can be likened to a principal sum owed to another which has traditionally carried with it interest as the fruit of the tree. See Himely, 9 U.S. (5 Cranch) at 317, 3 L.Ed. at 113. That a statutory obligation exists to refund to the ratepayers amounts overpaid by them is in no way inconsistent with the ratepayers' right to be fully compensated for the use of their money. That one is entitled to a refund of an amount overpaid to a utility does not affect this right either. This Court has recognized this principle in other contexts as well. In Metropolitan Life Insurance Co. v. State (1924), 194 Ind. 657, 144 N.E. 420, we held that one who is entitled to a tax refund, to be fully compensated for the loss of the use of his money, is entitled to interest on the amount despite the lack of statutory authority granting a right to receive such interest. See also Department of Revenue v. American Motorists' Ins. Co. (1979), 182 Ind. App. 645, 396 N.E.2d 907. Nothing in I.C. 8-1-3-6 remotely suggests that a consumer would be fully compensated for the use of his money without his consent by the utility's refund of only the difference in new, higher rates collected and rates previously authorized. We hold, therefore, that the Public Service Commission Act abrogates neither the statutory nor common law right to receive interest on money owed.
We turn to the position put forth by NIPSCO and adopted by the commission that, regardless of any right the ratepayers may have to interest, the commission lacks the statutory authority to make such an award in its refund orders. Given our resolution of CAC's argument on the ratepayers' right to interest, this question essentially devolves to whether the ratepayers can obtain relief from the commission for the interest owed them or whether they will be forced to seek relief in a separate action at law. We hold that the commission has such authority, as it has exercised in past decisions. While the commission lacks the equitable powers of a court of law, its task is essentially an equitable one in balancing the relationship between utilities and their consumers. See, e.g., City of Evansville v. Southern Indiana Gas & Elec. Co. (1975), 167 Ind. App. 472, 339 N.E.2d 562. Nowhere is the commission's responsibility in this regard more clearly delineated than it is in I.C. 8-1-2-69, which grants the commission wide authority to issue orders to remedy an "act" or "practice" of a utility that is "unjust" or "unreasonable." While we believe that there is statutory authority to include interest as an inherent part of the "difference" that is refundable under the refund section of the *161 act, I.C. 8-1-3-6, even were such authority lacking there, it would clearly be sanctioned under the grant of plenary power in I.C. 8-1-2-69, since enjoying the use of ratepayers' funds for, in some instances here, over eight years, without compensating those ratepayers for the use, falls squarely within the category of an unjust or unreasonable practice or act. Moreover, given that the Public Service Commission Act does not abrogate the right of ratepayers to receive interest on their funds that are retained by the utility, it would be strange to conclude that the legislature intended that ratepayers receive part of their just due from the commission and the rest through the courts. The commission's order should have included interest on the refund from the date such funds were paid to NIPSCO.
Both CAC and the Utility Consumer Counselor presented evidence before the commission as to the proper rate of interest and both employed methods which calculated a sum based on compound interest. The Court of Appeals addressed the issue of compound interest as damages in Indiana Telephone Corp. v. Indiana Bell Telephone Co. (1977), 171 Ind. App. 616, 638, 641, 360 N.E.2d 610, 612 (on rehearing), and quoted from 11 Williston on Contracts, § 1417 at 638 (3d ed. 1968): "The general rule is that compound interest is not allowed as damages." We adopt that general rule, and since the interest award here is based on the right to receive interest as damages, we hold that the interest should not be compounded but calculated as simple interest. Furthermore, we believe that the statutory rate set forth in 24-4.6-1-103, provides, in this instance, a reasonable gauge of a fair return on one's funds when held by another. Therefore, simple interest should be calculated on the refund at a rate of eight percent from the date any such funds were paid to NIPSCO.
CAC also argues that it is entitled to receive from the refund its reasonable attorneys' fees expended in securing the refund. In support of its position, it relies on the "common fund" theory, which allows attorneys' fees to be awarded out of a common fund to those who have, through their legal efforts, made the existence of the fund possible. NIPSCO maintains that the commission lacks the statutory authority to award attorneys' fees. The commission agreed with NIPSCO. Our analysis here tracks that used above in examining the interest issue. Specifically, we must examine whether CAC would have a right to attorneys' fees at common law, whether the Public Service Commission Act and its companion statutes abrogate this right, and whether the commission has authority to order that attorneys' fees be paid out of the refund. We also note that, as in the case of interest, the commission has previously allowed attorneys' fees to be retained out of a refund due utility ratepayers.
In City of Richmond v. Public Service Commission (1980), Ind. App., 406 N.E.2d 1269, the city of Richmond, acting through its utility Richmond Power and Light, was ordered by the commission to refund to its customers money it received as a refund from its wholesale supplier. However, the commission allowed Richmond to retain from the fund its costs in securing the refund which included "attorney's, economist's and engineer's fees." Id. at 1272. This portion of the order was upheld by the Court of Appeals; however, the record in that case reveals no discussion of the common fund theory of recovery of attorneys' fees as applied to a refund by a utility.
The theory was recognized by this Court in City of Hammond v. Darlington (1959), 241 Ind. 536, 162 N.E.2d 619, where an attorney-taxpayer had successfully challenged the payment of 124 judgments relating to a bond issue. It was noted in that case that the award of attorneys' fees is allowed to be paid from a common fund on the theory that those who benefit from the creation of the fund or from the creation of any other legal benefit should share in the expense of producing the benefit. Id. at 162 N.E.2d 622 (quoting State ex rel. Weede v. Bechtel (1952), 244 Iowa 785, 814, 56 N.W.2d 173, 179). The rationale is an equitable one, designed to prevent "free riders" from taking advantage of the fund without paying their fair share. CAC has created a benefit worth over fifty million *162 dollars to NIPSCO ratepayers. Out of this, they request attorneys' fees of approximately $77,000. We have little doubt that at common law CAC could receive attorneys' fees out of this common fund they worked to create.
NIPSCO argues, however, that because I.C. 8-1-1.1-5 creates for the public's benefit, the position of utility consumer counselor, who is charged with representing ratepayers in all matters involving utilities, allowing attorneys' fees out of the refund will amount to charging the ratepayers twice for the legal services performed on their behalf. In this regard, it should be noted that the utility consumer counselor did not represent the ratepayers in the original Bailly cost amortization action before the commission or in litigation of NIPSCO I, which was appealed to the United States Supreme Court. CAC shouldered that burden. Additionally, the record here indicates that the efforts of the utility consumer counselor and CAC's attorneys were not particularly duplicative of one another. The utility consumer counselor did not even brief three of the issues raised by CAC in their appeal. Furthermore, in all likelihood, because of the length of time the refund here has been withheld and the procedures under which it will be dispersed, a substantial portion of the refund will not be paid out at all, owing to the fact that many of the ratepayers entitled to a refund will not be located. It seems likely, therefore, that those actually receiving refunds will not be adversely affected by the payment of attorneys' fees from the fund.
However, the question remains whether, in creating the office of the utility consumer counselor, the right to receive attorneys' fees from a utility refund under a common fund theory has been abrogated. We hold that it is not. By its express terms, the act preserves the right of ratepayers to be represented by independent counsel in matters before the commission or in other proceedings. I.C. 8-1-1.1-6(e). If there is an unmistakable implication here, it cuts in favor of preserving the common law right to attorneys' fees under a common fund theory, not against it. Applying the same rationale used above on the issue of interest, we further hold that the commission has the statutory authority, as it exercised in the City of Richmond proceeding, to order, under a common fund theory, that attorneys' fees be paid out of a refund due ratepayers.
The final issue raised by CAC concerns the authority of the commission to grant a stay of its order pending appeal. NIPSCO sought from the commission a stay of the commission's order so that it could avoid paying the refund until this appeal was decided. The commission granted the stay, finding that NIPSCO could be irreparably harmed should the refund order not be sustained on appeal. It also found that there was sufficient statutory authority to grant the stay in I.C. 8-1-2-72, which gives the commission the power to rescind, alter or amend its orders, and that the commission was the only available forum in which NIPSCO could seek a stay. CAC argues that the commission lacked the authority to grant a stay under the provisions of the statute governing judicial review of commission decisions. I.C. 8-1-3-1 et seq. NIPSCO does not address the merits of this claim, arguing that the commission's stay was a "reasonable and necessary act."
Regardless of the reasonableness and necessity of granting NIPSCO's request for a stay, the commission, by the express terms of the act governing judicial review of commission orders, clearly lacked the authority to grant NIPSCO's request. The provisions of I.C. 8-1-2-72, allowing the commission to rescind, alter or amend its orders, are limited by those in I.C. 8-1-3-7 (West 1982) which states:
Upon determination of the appeal, the court shall have jurisdiction to affirm or set aside such decision, ruling or order of the commission, in whole or in part, or remand the proceeding to the commission with instructions.
The statute goes on to discuss what the commission may do on remand and then states:
The Appellate or Supreme Court, as the case may be shall also have jurisdiction, upon application of the commission or *163 any party, to order or enjoin temporarily or permanently the enforcement of any determination, ruling or order of the commission made in the cause.
This section contemplates that once a cause has been brought before an appellate court and the appeal has been determined, that court retains exclusive jurisdiction over enjoining or enforcing any orders of the commission made pursuant to the remand. It contemplates the situation before us. NIPSCO I was a determination of an appeal from a commission order which granted NIPSCO a rate increase to recoup its sunk costs in Bailly N-1. The rate order was found to be contrary to law, and the cause was remanded to the commission with instructions to vacate that order. The commission, pursuant to that directive, entered an order directing NIPSCO to excise the Bailly costs from its rates and set a hearing to determine the amount of refund. NIPSCO II held that NIPSCO was not entitled to a hearing prior to the commission's determination that the rates should be excised, nor was it entitled to a stay pending appeal of that determination. The order appealed from here grew out of the hearing to determine the amount and manner of refund due the ratepayers. Thus, all orders subsequent to NIPSCO I were made pursuant to our determination of the appeal in that case and were an integral part of that cause. This falls squarely within I.C. 8-1-3-7. Any other reading would render superfluous the language of that section allowing the commission to apply for an order from this Court to enjoin the enforcement of its orders "made in the cause." If the commission had the authority to stay its own orders under these circumstances, there would be no need for the statute's grant of authority to the commission to petition an appellate court to enjoin or enforce such orders. While the issue here appears to be moot, it is, nevertheless, an issue which is capable of repetition while evading review, and we therefore hold that once an appeal has been determined by this Court, any party wishing to stay further orders issued by the commission pursuant to the determination of that appeal must petition this Court for such relief.
The issues in this cause have been debated and litigated for nearly nine years before the commission, the Court of Appeals and this Court. Despite our determination four years ago in NIPSCO I that NIPSCO's collection of the amortized costs of Bailly N-1 from its ratepayers was unlawful, NIPSCO has yet to refund to its ratepayers any of the money it collected under the commission's initial order. It is time that the ratepayers were compensated for the money taken and withheld from them. This cause is remanded to the commission. The commission is instructed to enter an order directing NIPSCO to refund, with interest as herein provided, the money collected from NIPSCO's ratepayers attributable to the amortized sunk costs of Bailly N-1. The commission is further instructed to order that CAC's attorneys' fees be paid out of the refund. Any further requests for stays from the commission's orders in this cause shall be directed to this Court. The commission's order from which this appeal is taken is affirmed in all other respects.
PIVARNIK and DICKSON, JJ., concur.
SHEPARD, C.J., concurs with separate opinion.
GIVAN, J., dissents with separate opinion.
SHEPARD, Chief Justice, concurring.
It has always seemed to me that the Commission's broad authority to regulate both the capital and operating expenses of Indiana's utilities includes the authority to permit recovery of expenses for studies conducted in determining whether to build or cancel new generating facilities.
Indeed, the Public Service Commission permitted Public Service Indiana to recover such expenses in the Marble Hill case. Public Service Company of Indiana, Ind. Public Service Commission, No. 36318 (June 10, 1981). Authorizing recovery of some such expenses obviously benefits both consumers and utility investors by *164 fostering efficient generation of energy. It is the same business principle under which the Commission sometimes permits a utility to retire an inefficient plant early and still recapture all of the capital invested in it.
When this case was before us as Nipsco I, 485 N.E.2d 610, the Commission had approved recovery of all expenses associated with the Bailly project. I concluded that recovering part of those expenses was authorized by statute. Persuaded by my colleagues that the Court could only approve the Commission's order in whole or set it aside in whole, I joined in setting it aside. I believed that the various opinions in Nipsco I should be read as authorizing the Commission to permit recovery of Nipsco's planning and analysis expenses.
As best I can tell from the Commission's decision on remand, it chose to deny NIPSCO recovery of $22 million in planning and analysis expenses because it believed that it was not authorized to do so under law. I think the Commission's prior decisions and the opinions of this Court in Nipsco I suggest otherwise. Indiana & Michigan Electric Company, Ind. Public Service Commission, No. 34588 (January 31, 1977); Public Service Company of Indiana, Ind. Public Service Commission, No. 36318 (June 10, 1981); Public Service Company of Indiana, Ind. Public Service Commission, No. 36818 (January 20, 1983).
While I believe the law permits the Commission to allow recovery of these expenses, I cannot say that I think the law requires the Commission to do so. The underlying rationale for allowing these expenses arises from the need to balance consumer and investor interests, a task largely assigned to the Commission's judgment. Thus, with some reluctance, I join the decision of today's majority.
GIVAN, Justice, dissenting.
I respectfully dissent from the majority opinion in this case and for the sake of brevity would refer the reader to my dissenting opinion in Citizens Action Coalition of Indiana, Inc. v. Northern Indiana Public Service Company (1985), Ind., 485 N.E.2d 610, cert. denied, 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687. My dissenting opinion begins on page 619. I would point out to the reader that I also joined Justice Prentice in his dissenting opinion which begins at page 621.
I also dissented in Northern Indiana Public Service Company v. Citizens Actions Coalition of Indiana, Inc. (1986), Ind., 493 N.E.2d 762. My dissenting opinion begins at page 764. I hold fast to the views stated in my dissenting opinions and in the dissenting opinion written by Justice Prentice.